Alexander **ZAUTRA** and the Human Rights Party, an unincorporated association, Plaintiffs,

v.

Clyde L. **MILLER**, Secretary of the State of Utah, and W. Sterling Evans, Salt Lake County Clerk, Defendants.

No. C 130–72.

United States District Court, D. Utah, Central Division.

Sept. 20, 1972.

John D. O'Connell, Salt Lake City, Utah, for plaintiffs.

Robert B. Hansen, Deputy Atty. Gen., State of Utah, for Clyde L. Miller.

Carl J. Nemelka, Salt Lake County Atty., Salt Lake City, Utah, Merrill Davis, Deputy Salt Lake County Atty., for W. Sterling Evans.

Before LEWIS, Chief Judge, BARRETT, Circuit Judge, and ANDERSON, District Judge.

## OPINION

PER CURIAM.

■ Utah Code Ann. § 20–3–2(g)(2) (Supp. 1971) requires new political associations to secure the signatures of 500 registered voters, including at least ten signatures of registered voters from each of ten counties, in order to qualify as a political party with the accompanying right to place candidates on the ballot. Plaintiffs ask this court for declaratory and injunctive relief, 28 U.S.C. §§ 2201–2202, on the grounds that the Utah law, insofar as it requires ten signatures of registered voters from each of ten counties, is unconstitutional as a violation of the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs' standing to raise this issue is clear. E. g., Moore v. Ogilvie, 394 U.S. 814, 89 S. Ct. 1493, 23 L.Ed.2d 1 (1969). A three-judge court was convened to hear the matter in accordance with 28 U.S.C. §§ 2281, 2284.

Plaintiff Human Rights Party, of which plaintiff Zautra is a prospective candidate, sought to gain recognition as a political party, with accompanying access to a place on the ballot, by complying with the provisions of Utah law.[1]

---

1. Utah Code Ann. § 20–3–2(g)(2) (Supp. 1971) provides:

(2) Any organization of registered voters whose organization did not participate in the last preceding November election or whose organization polled for any of its candidates in the preceding November election a total vote equivalent to less than two per cent of the total vote cast for all representatives in Congress, which [sic] under a common name or designation, shall file with the secretary of state a petition signed by registered voters equal in number to at least five hundred including at least ten registered voters from each of ten counties. The petition shall declare that signers are or desire to become members of the party or group, the name of which shall be stated, and that they desire to participate in a county organizing convention. The names of the registered voters so petitioning need not all be on one petition, but may be in one or more petitions. The petition shall be filed with the secretary of state on or before March fifteenth of the year in which an election is to be held. The secretary of state shall determine whether or not the required number of registered voters appears on the petition and shall certify his findings to the filing officer of the group within 30 days of the filing of the petition.

County organizing conventions shall be held in participating counties on or before April 1st of the year in which an election is to be held. Due notice of the time and place of the convention shall be given to each petitioner resid-

ing in the county, and such petitioners shall be delegates to the convention. Delegates shall elect a county central committee, a chairman and vice-chairman of opposite sex, and a secretary. Delegates to the state convention shall also be elected; and one delegate shall be elected for a definite number of petitioners in each county, the number of petitioners per delegate to be determined by the group initiating the creation of the new party, but each county shall be entitled to at least one delegate.

A state organizing convention shall be held on or before April 15th of the year in which an election is to be held. Delegates to this convention, which shall consist of those delegates elected at county conventions together with the officers of the group initiating the new party, shall elect a state central committee, a chairman and vice-chairman of opposite sex, and a secretary. The number of members of the central committee to which a county shall be entitled shall be in proportion to the number of petitioners residing in such county, but there shall be at least two members, a man and a woman, from each county in the state.

On or before April fifteenth of the year in which an election is to be held, the state committee of the new party shall file with the secretary of state the names of the state and county chairmen, vice-chairmen and secretaries, together with a certificate stating that the provisions of this section have been complied with. For purposes of the next ensuing election, the party shall then be consid-

The signatures of 500 registered voters apparently were obtained in accordance with the statute, and the validity of this provision is not contested.[2] But included among those signatures were at least ten voters' signatures from each of only nine counties, plus nine voters' signatures from a tenth county and two from an eleventh county. Stipulation of Facts, ¶ 4, June 15, 1972. Thus plaintiff Human Rights Party fell one signature short of compliance with the statute's requirement of ten voters' signatures from each of ten counties and plaintiff Zautra was denied a place on the ballot.

Plaintiffs acknowledge that they could have complied with the statute had they realized in time that certain of their signatures were invalid. But they claim that under the present circumstances the requirement in question has denied them equal protection of the laws. In illustration of this proposition, they note that over half of the persons in Utah reside in two of the state's 29 counties. Thus, to take the extreme example, a party heavily concentrated in a few counties might represent a majority of Utah voters but nevertheless not have power enough to muster ten signatures in ten counties and might therefore be denied recognition as a result of the provision in question. In effect, a small number of registered voters in 20 sparsely-settled counties would thus have prevented the appearance on the ballot of a party having substantial voter support.

Plaintiffs rely principally upon the case of Moore v. Ogilvie, *supra*. There the United States Supreme Court struck down an Illinois law which required independent candidates to obtain 25,000 signatures including the signatures of 200 qualified voters from each of at least 50 of the state's 102 counties in order to obtain a place on the ballot. By overruling the earlier case of MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3 (1948), the court also invalidated a similar provision applicable to candidates for new political parties. In taking this action, the court noted that the Illinois population was (as is Utah's) highly concentrated in a few counties thereby admitting of the possibility that voters in sparsely-populated counties might block access to the ballot by large numbers of the state's voters who supported an independent or new party candidate. As a result, the law was found to be discriminatory in violation of the Equal Protection Clause of the Fourteenth Amendment.

The Utah law questioned by plaintiffs differs substantially in the force of its impact upon political candidacies from that encountered by the court in *Moore*. The Utah law requires only 10 signatures from each of 10 counties. On a basis proportional to the two states' populations, this signature requirement is about one-ninth as burdensome as that of Illinois'.[3] In addition, signatures are required from only about one-third of

---

ered a political party and shall comply with all the other provisions of the laws of Utah regarding political parties. If no national party convention is held, the names of the candidates for the office of President and vice-president of the United States shall be those designated by the state central committee of the new party.

2. *See, e. g.*, Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (approving Georgia's general signature requirement).

3. It appears that comparison by population is roughly equivalent to comparison by registered voters. According to the 1970

census, the Illinois population is approximately 11 million, the Utah population approximately one million. The Illinois geographical signature requirement amounted to 10,000 (200 voter signatures from each of 50 counties) or about 900 signatures per one million population. In contrast, the Utah law requires only 100 geographically distributed signatures (ten voters signatures from each of ten counties) or about 100 signatures per one million population. Supplementing the geographical signature distribution requirement, the Utah law requires that a total of 500 signatures of registered voters without respect to county of residence be gathered. This provision is not challenged, but it may be noted that on a basis

Utah's counties (10 of 29), while the Illinois requirement approaches one-half (50 of 102). Furthermore, Utah's geographical requirement applies only to the qualification of political parties—not to the qualification of independent candidates as did the Illinois statute. Utahans may gain an independent place on the statewide ballot by merely gathering the signatures of 300 voters without any geographical restriction. Utah Code Ann. § 20–3–38 (Replacement Vol. 3, 1969).[4]

As may be seen, in contrast to the Illinois statute struck down in *Moore*, the Utah statute places only minimal burden upon prospective candidates and parties. Nevertheless, the geographical signature distribution requirement does impose some disproportionate weight upon the voter signatures which may appear on petitions seeking party recognition in Utah. The question before this court is whether the Fourteenth Amendment mandates the elimination of even minimal geographical burdens of conceivably discriminatory effect upon the formation of political parties.

For circumstances such as these which affect the franchise somewhat obliquely, we believe the answer must now be found in the recent instructions of the United States Supreme Court in Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). There, in the process of striking down large Texas candidate registration fees, the court first required a showing that the alleged dis-criminatory law have "a real and appreciable impact on the exercise of the franchise" before the court would apply the strict test of reasonable necessity to determine its validity. *Bullock, supra* at 144, 92 S.Ct. at 856. In effect, the court said that those laws which created no "real and appreciable impact . . . on the franchise" were subject to lower standards of review requiring only a showing of some "rational basis" for their existence rather than the stricter requirement of "reasonable necessity." *See, Bullock, supra* at 142, 144, 92 S.Ct. 849.

We hold that the Utah law requiring of prospective political parties ten signatures from each of ten counties has not exerted and continues to exert no real or appreciable impact upon the franchise in Utah. We hold further that this law rests upon a rational basis.

New political parties have been successfully formed in Utah through compliance with the law.[5] The plaintiffs in this case, whose support is apparently concentrated in a few counties, have stipulated that they failed to comply with the law only because they did not learn until the filing deadline was upon them that some of their signatures were not those of registered voters. Furthermore, political groups which do not qualify as parties have reasonably unfettered access to the ballot by alternate means, thereby minimizing the effect of the law in question upon the franchise.[6] Plaintiffs have supplied no indication

---

proportionate to population, the corresponding Illinois requirement of 25,000 total signatures was 4½ times as high as that of Utah.

4. Presidential electors, however, may apparently not run as independents. Markham v. Bennion, 122 Utah 562, 252 P.2d 539 (1953). And there is some question under Utah law as to whether a prospective candidate may first attempt to gain the recognition of a new political party for which he wants to run and, upon failure to do so, then file as an independent candidate for the same election. Letter from Assistant Utah Attorney General Frank V. Nelson to Deputy Utah Secretary of State Harvard R. Hinton, April 13, 1972.

5. *Cf.,* Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), which struck down party qualification requirements because they effectively precluded the formation of new parties.

6. This is in contrast to the situation in Williams v. Rhodes where Ohio law made "no provision for ballot position for independent candidates as distinguished from political parties. . . ." *Id.* at 26, 89 S.Ct. at 8, discussed in Jenness v. Fortson, *supra* note 2 at 435, 438, 91 S.Ct. 1970. *But see,* text accompanying note 4, *supra.*

that the Utah law has any real, or appreciable, discriminatory effect upon the franchise in Utah.

■ Utah law contemplates the establishment of political parties with detailed, statewide organizations. During the first year of operations, the law questioned by plaintiffs contemplates the holding of conventions in at least the minimum ten counties in which signatures were obtained. Utah Code Ann. § 20–3–2(g)(2) (Supp. 1971), set out in note 1, *supra*. After the first year, a new political party must hold organizational conventions in every county in the state. Utah Code Ann. § 20–4–1 (Supp. 1971). Thus the political party qualification requirements rest upon a rational basis: they are an intermediate step adapted to the orderly establishment of a statewide party organization. The requirement of such a statewide organization is a legitimate state purpose so long as it imposes no undue burden on the election process. *See*, Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L. Ed.2d 554 (1971); *cf.*, *supra* note 5.

■ Traditionally political parties have exerted the greatest of influence upon state and national government. It is not unreasonable for a state to require such parties to provide even the residents of sparsely-settled counties with an opportunity to involve themselves in party machinery which may ultimately control their state or county policies. In return for a party's commitment to statewide operation, the State of Utah sanctions primary elections for the parties and provides state recognition of party decisions concerning the selection of candidates. *E. g.*, Utah Code Ann. § 20–4–1 to 20–4–9 (Supp. 1971). Should statewide responsibility appear oppressive to any political group, the state provides an opportunity for independent access to the ballot, but requires those who elect this less circumscribed alternative to forego party perquisites such as candidate recognition. Utah Code Ann. § 20–3–38 (Replacement Vol. 3, 1969). This scheme is fundamental to Utah's representative democracy. Its newly-integrated requirement that prospective political parties obtain the signatures of ten registered voters from each of ten counties does not violate plaintiffs' Fourteenth Amendment rights.

The above shall be considered findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

Judgment for defendants.