Eugene J. McCARTHY, Susan A. Carl, Helen H. McNeese, James F. Carpenter, and Margrit E. Dallaire,

v.

J. Joseph GARRAHY, Governor of the State of Rhode Island and Providence Plantations, and Robert F. Burns, Secretary of State for the State of Rhode Island and Providence Plantations.

Civ. A. No. 76–0449.

United States District Court, D. Rhode Island.

Nov. 13, 1978.

Amato A. DeLuca, American Civil Liberties Union, Warwick, R. I., for plaintiffs.

J. Peter Doherty, Special Asst. Atty. Gen., for the State of Rhode Island, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

The plaintiffs seek injunctive relief and a declaration that Rhode Island General Law § 17–16–8 [1] is unconstitutional. Because section 17–16–8 requires an independent candidate to collect out of 1000 total petition signatures 25 from each of the five counties in the state, the plaintiffs assert that the section unlawfully deprives and infringes the rights secured to them under Article II, Section 1, clauses 2 and 4 and Article VI, clause 2 of the United States Constitution and the First, Twelfth, and Fourteenth amendments thereto.[2]

Plaintiff, Eugene J. McCarthy, was an announced independent candidate for President of the United States having won five terms in the United States House of Representatives and two terms in the United States Senate. He obtained 1,012 valid signatures on the nominating petition but did not secure the necessary twenty-five signatures from one of the five counties, namely Bristol County. The Secretary of State and

---

[1]. R.I.G.L. § 17–16–8 (1976):

Number of signers required for nomination papers.—

(a) *United States Senator or Governor.*—The nomination papers of a candidate for nomination for presidential elector, United States senator or governor shall be signed, in the aggregate, by at least one thousand (1,000) voters, each county of the state being represented by at least twenty-five (25) resident signers.

(b) Congressman.—The nomination papers of a candidate for nomination for representative in congress shall be signed, in the aggregate, by at least five hundred (500) voters, each county in which the congressional district lies being represented by at least twenty-five (25) resident signers.

(c) General State Offices.—The nomination papers of a candidate for nomination for any of the general offices of the state, excluding governor, shall be signed, in the aggregate, by at least five hundred (500) voters, each county in the state being represented by at least ten (10) resident signers.

(d) State Senator.—The nomination papers of a candidate for nomination for senator in any senatorial district, shall be signed, in the aggregate, by at least one hundred (100) voters of such senatorial district.

(e) *State Representative.*—The nomination papers of a candidate for nomination for member of the house of representatives from any representative district shall be signed, in the aggregate, by at least fifty (50) voters of such representative district.

(f) City Offices.—The nomination papers of a candidate for nomination for any local office to be filled by the voters of any city at large shall be signed, in the aggregate, by at least two hundred (200) voters of such city, provided, however, that in the city of Providence at least five hundred (500) signatures shall be required.

(g) Voting District Moderator or Clerk.—The nomination papers for a candidate for voting district moderator or clerk in any town shall be signed, in the aggregate, by at least ten (10) voters of such voting district.

(h) Other Offices.—The nomination papers of a candidate for nomination for other offices covered by § 17–15–7, shall be signed, in the aggregate, by fifty (50) voters.

[2]. Article II, Section I, clauses 2 and 4.

*Section 1, Clause 2. Presidential electors*

Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

Section 1, Clause 4. Qualifications, Office of President

No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty-five Years, and been fourteen Years a Resident within the United States.

Article VI, Clause 2.

Clause 2. Supreme Law of Land

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

the Rhode Island Board of Elections certified that the plaintiff had fallen one shy of the required number but had complied with all other provisions of the election laws. Of the signature submitted to the Secretary of State, more that 25 were from Bristol County, but only 24 from that county were validated by the Secretary of State.

By reason of the foregoing, plaintiff McCarthy was effectively barred from electoral consideration, in Rhode Island, of his independent candidacy for President; plaintiffs Susan A. Carl, Helen H. McNeese, James F. Carpenter and Margrit E. Dallaire, were effectively barred from appearing on the 1976 general ballot of Rhode Island as presidential electors for McCarthy; and were effectively barred from voting for the plaintiff McCarthy as an independent presidential candidate.

By county, the number of Rhode Island voters eligible to vote in the November 2, 1976, election was: Bristol County 28,092; Newport County, 43,928; Washington County, 47,925; Kent County, 93,303; Providence County, 331,744.

The total number of Rhode Island voters eligible to vote in the November 2, 1976, election was 544,992.

By percentage, 5.15% of Rhode Island voters reside in Bristol County; 8.06% reside in Newport County; 8.79% reside in Washington County; 17.12% reside in Kent County; 60.87% reside in Providence County.[3]

The plaintiffs argue that the Rhode Island statute "not only disproportionately enhances the voting power of rural voters over urban voters merely on the basis of the place of residence of the former class of voters, but it also invests the voters of any one county, no matter how sparsely settled, with an absolute veto power over the nomination of any independent candidate without regard to the fact that the candidate may be favored by an overwhelming majority of voters of the state". The plaintiffs argue this statutory distributive requirement is invalid under the teachings of

*Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). The defendants acknowledge that "(t)o sustain the validity of the instant statute . . . the weight of (*Moore*) and its progeny must be overcome."

■ Because the election has long passed we must first decide if the issue before the Court is moot. There is no question that today the state of Rhode Island continues the same policy and the burden the statute imposes on the nomination of candidates for statewide office remains and controls future elections. Language in *Storer v. Brown,* 415 U.S. 724, 737 n.8, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974) is directly applicable:

> The 1972 election is long over, and no effective relief can be provided to the candidates or voters, but this case is not moot, since the issues properly presented, and their effects on independent candidacies, will persist as the California statutes are applied in future elections. This is, therefore, a case where the controversy is "capable of repetition, yet evading review." *Rosario v. Rockefeller,* 410 U.S. 752, 756 n.5, 93 S.Ct. 1920, 36 L.Ed.2d 419 (1973); *Dunn v. Blumstein,* 405 U.S. 330, 333 n.2, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). The "capable of repetition, yet evading review" doctrine, in the context of election cases, is appropriate when there are "as applied" challenges as well as in the more typical case involving only facial attacks. The construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated before an election is held.

On the strength of this reasoning, I find this case is not moot.

---

3. *See* stipulation entered May 3, 1978. The complaint was filed October 14, 1976.

There is little need to belabor the treasured position that voting for the candidate of one's choice holds among the panoply of freedoms we enjoy: restrictions on this right "strike at the heart of representative government", *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964), and "(o)ther rights, even the most basic, are illusory if the right to vote is undermined", *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). The statute at issue in this case is alleged to burden this freedom by granting some voters more power than other voters, solely on the basis of the county in which they happen to live.

A number of cases have considered the validity of distributive requirements for candidate nominating petitions. The great majority have found such requirements unconstitutional, following the U.S. Supreme Court's lead in *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1968). *See Communist Party v. State Board of Elections of Illinois,* 518 F.2d 517 (7th Cir.), *cert. denied,* 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975); *Communist Party of Illinois v. Ogilvie,* 357 F.Supp. 105 (N.D.Ill. 1972) (three-judge court); *Baird v. Davoren,* 346 F.Supp. 515 (D.Mass.1972); *Socialist Labor Party v. Rhodes,* 318 F.Supp. 1262 (S.D.Ohio 1970) (three-judge court), *aff'd mem. Sweetenham v. Gilligan,* 409 U.S. 942 (1972); *Socialist Workers Party v. Rockefeller,* 314 F.Supp. 984 (S.D.N.Y.), *aff'd mem.* 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970); *Socialist Workers Party v. Hare,* 304 F.Supp. 534 (E.D.Mich.1969). Only three cases have upheld such requirements. *See Udall v. Bowen,* 419 F.Supp. 746 (S.D. Ind.), *aff'd mem.* 425 U.S. 947, 96 S.Ct. 1720, 48 L.Ed.2d 191 (1976); *Zautra v. Miller,* 348 F.Supp. 847 (D.Utah 1972); *Moritt v. Governor of New York,* 42 N.Y.2d 347, 397 N.Y.S.2d 929, 366 N.E.2d 1285 (1977), *app. dismissed* 434 U.S. 1029, 98 S.Ct. 758, 54 L.Ed.2d 777 (1978).[4]

*Moore* invalidated a provision of the Illinois election laws requiring that an independent candidate's petition for a statewide election be signed by at least 25,000 voters, and include 200 voters' signatures from each of at least 50 of the state's 102 counties. The Court rejected the argument that this law served a valid state interest in assuring state-wide support for launching a new political party and found it invalid under the Equal Protection Clause. It stated:

This law applies a rigid, arbitrary formula to sparsely settled counties and populous counties alike, contrary to the constitutional theme of equality among citizens in the exercise of their political rights. The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government.

Under this Illinois law the electorate in 49 of the counties which contain 93.4% of the registered voters may not form a new political party and place its candidates on the ballot. Yet, 25,000 of the remaining 6.6% of registered voters properly distributed among the 53 remaining counties may form a new party to elect candidates to office. This law thus discriminates against the residents of the populous counties of the State in favor of rural sections. It, therefore, lacks the equality to which the exercise of political rights is entitled under the Fourteenth Amendment. 394 U.S. 814, 818–819, 89 S.Ct. 1493, 1496, 23 L.Ed.2d 1.

This decision compelled the court in *Socialist Workers Party v. Hare, supra,* to strike down a similar Michigan election provision which required that nominating petitions for independent candidates be signed by at least 100 residents in each of the ten (out of

---

**4.** A county distribution requirement for the signatures needed to place a popular initiative on the ballot has been upheld on the grounds that the fundamental interest in voting was not involved and that there is no fundamental interest in placing measures, as opposed to candidates, on the ballot. *Massachusetts Public In-* *terest Research Group v. Secretary of the Commonwealth,* Mass.Adv.Sh. (1978) 1041, 375 N.E.2d 1175 (1978). Whatever the merits of that holding, it is clear that it is inapplicable to this case, where the nomination of candidates is involved.

83) counties. Similarly, the court in *Socialist Labor Party v. Rhodes, supra,* relied upon *Moore* and *Hare* to strike down requirements that a petition for an independent candidate include the signatures of at least two hundred voters from each of at least thirty counties and limited the total from any one county to no more than one fourth of the total needed. The court found such requirements violative of the principal of one man, one vote, and found no compelling state interest in such requirements.

*Baird v. Davoren, supra,* relied on both *Moore* and *Hare* in holding invalid a Massachusetts statute which limited the number of signatures which could be obtained from a single county to one third of the total. All four of these cases were relied upon by the trial court in *Communist Party of Illinois v. Ogilvie, supra,* to strike down another Illinois requirement that no more than 13,000 of the 25,000 signatures needed to qualify a new party could be counted from any one county. The Seventh Circuit later affirmed this conclusion in a separate case. *Communist Party v. State Bd. of Elections of Illinois, supra.*

Unlike the present case, these cases involved distribution requirements which did not require a minimum number of signatures from every county. Consequently, it was possible to obtain ballot status without getting signatures in every county. Nonetheless, the courts had little trouble finding the requirements violated the equal protection clause because they gave greater weight to the votes of some citizens. The present case, in requiring a minimum number of signatures from each county of the state rather than a minimum number of signatures from a number of counties less than the total, presents a more egregious example of distributive requirements. In the case at bar any one county's voters can prevent a candidate from obtaining ballot status: the very fact pattern giving rise to this litigation. So far as this Court has been able to determine, only one other court has addressed this precise issue. In *Socialist Workers Party v. Rockefeller, supra,* a three-judge court struck down a requirement that fifty signatures of a total signature requirement of 12,000 be obtained from each county of the state. The court rejected an argument that the requirement of only fifty signatures was *de minimis,* differing significantly from the two hundred signature (in fifty counties) requirement struck down in *Moore,* and found the New York statute constitutionally indistinguishable from the Illinois statute. Most significantly for the present case, the court noted:

> The rigid distribution formula established by Section 138(5)(a) of the Election Law invests voters in *each* rural, less populous county with an absolute *equal* veto power over the nomination of any candidate regardless of that candidate's possible overwhelming popularity with a majority of the voters of the State. . . . [I]t is the right of all qualified voters to equality in the exercise of their political rights which invalidates this statute. . . .
> The fact that this unconstitutional burden has been hurdled before, and not, it should be noted, without considerable drain on the limited resources available to new parties, cannot negate the fact that by overweighting and overvaluing the votes of those living in less populated counties the votes of the majority of the electorate have been diluted and undervalued. 314 F.Supp. at 990–91.

Similarly, the Rhode Island statute at issue in the present case dilutes the value of the votes of those living in more populous counties in favor of those living in less populous counties, and grants the residents of any county in the state a theoretical veto power over the nomination of any candidate, regardless of that candidate's overwhelming support elsewhere in the state. The only difference in the Rhode Island statute is that 25, rather than 50, signatures are required, and only five counties, not the considerable number in New York State, are involved. Though it may be said the Rhode Island statute imposes a lesser burden, the fact remains that the same inequality in voting power exists.

■ Under Section 17–16–8, a candidate must obtain signatures from .09% (25 out of 28,092) of the voters in Bristol County, but need obtain signatures from only .008% (25 out of 331,744) of the voters in Providence County. Therefore, the signature of a voter in Bristol, the least populous county, is worth ten times more than the signature of a voter in Providence. Such an inequality appears to violate the one man, one vote principle of *Moore* as much as the inequality in *Socialist Workers Party v. Rockefeller.* As the court in *Socialist Workers Party v. Rockefeller* noted, under *Moore* such inequality cannot be justified on the grounds that it is designed to require statewide support for launching a new party or an independent candidate. 314 F.Supp. at 990.

In view of the United States Supreme Court's summary affirmance of *Socialist Workers Party v. Rockefeller,* the case closest on the facts to the present case, this Court is compelled to follow its holding absent some distinguishing basis. *Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). Defendant suggests, however, that although there may be some inequality under the Rhode Island scheme, it is outside the parameters of the *Moore* decision, which drew its logic from the reapportionment decisions. These decisions were concerned with districting which gave the votes of citizens in an underpopulated district more weight than those in an overpopulated district.[5] They suggest, instead, that this case is more like *Udall v. Bowen, supra,* which was also summarily affirmed by the United States Supreme Court. In that case, a three-judge court upheld an Indiana requirement that a candidate who wishes his name placed on the Indiana presidential preference primary obtain the signatures of 500 voters in each of the state's eleven congressional districts. The court distinguished *Moore* and its progeny on the grounds that unlike the counties in *Moore,* the congressional districts in Indiana are substantially equal in population. Consequently, the court concluded that the requirement avoided equal protection objections by giving equal weight to the signatures of each voter.

Certainly the Indiana statute avoided the most objectionable aspect of the Illinois statute—that the signatures of voters in relatively less-populated counties were given greater weight. However, this Court notes that, as the dissenting judge pointed out, even with equal districts,

> the statute gives the voters in one congressional district an absolute power over the nomination of a Presidential candidate regardless of the fact that that candidate may have overwhelming support with a majority of the voters in the other ten congressional districts of the state. Thus, there is a denial of equal protection and due process guaranteed to the voters of the State of Indiana by the Fourteenth Amendment. 419 F.Supp. at 750 (Swygert, J., dissenting).

Indeed, the Indiana statute had the same objectionable quality the United States Supreme Court found in the Illinois statute—voters in a rural area could prevent a candidate supported by more urbanized areas who constituted a majority of the entire state from obtaining ballot status. *See Moore v. Ogilvie,* 394 U.S. at 819, 89 S.Ct. 1493. That the more rural area might have a population equal to that of each of several urban areas does not eliminate the fact that it is given a veto power over ballot access.

---

5. *See Developments in the Law: Elections,* 88 Harv.L.Rev. 1111, 1150–51 (1975). The secondary literature disagrees on the extent to which *Moore* forecloses *any* geographical distribution requirements. *See, e. g., id.* (proportional distribution requirements consistent with one person, one vote, but may in conjunction with other requirements create an unconstitutionally severe restriction on ballot access); L. Tribe, Constitutional Law § 13–20 at 781 n.22 (1978) (geographical distribution requirements may be unconstitutional because they discriminate against candidates who reflect geographically concentrated interests); *Nominating Petition Requirements for Third-Party and Independent Candidate Ballot Access,* 11 Suff.U.L.Rev. 974, 1006–08 (1977) (*Moore* implies all geographic distribution requirements are unconstitutional). The United States Supreme Court's affirmance of *Udall v. Bowen,* 419 F.Supp. 746 (S.D.Ind.), *aff'd mem.* 425 U.S. 947, 96 S.Ct. 1720, 48 L.Ed.2d 191 (1976), indicates that distribution by congressional districts of substantially equal population is permissible.

The Supreme Court's affirmance of *Udall* indicates that at least some schemes which weight each signature equally are valid, regardless of the possibility that one area could "veto" the choice of another equally represented area. This is in keeping with the teachings of the Supreme Court in *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), that the voting power of each individual must be equal within the area electing a candidate, whether he or she lives in a rural or urban county:

, Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. . . . The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions. 372 U.S. at 379–80, 83 S.Ct. at 808.

Under the scheme in *Udall*, each voter had an equal voice in helping his candidate to obtain ballot status; the value of a signature from one district was virtually equal to the value of a signature from another district.[6]

At first glance *Udall* seems inapplicable to the Rhode Island scheme; the signature requirement is distributed over counties of substantially unequal population, not congressional districts of roughly equal population. However, defendants argue that it is effectively the same as the Indiana approach. They argue that so long as the ratio of the minimum number of signatures for each county to the total number of signatures required is less than the ratio of that county's population to the state as a whole, the principle of *Moore* is not violated. While this might be true if the signature requirement were truly proportional, it is not convincing here. The fact remains that the signature of a voter from Bristol County is ten times more valuable than a signature from Providence County. Consequently, the Court concludes that *Udall* is inapplicable to this case.[7]

Defendants' argument can also be viewed as urging that the distribution requirement is *de minimis*. The United States Supreme Court has held that not every restriction or incidental burden on the right to vote or associate is subject to a stringent standard of review, requiring a compelling state interest. *See Storer v. Brown*, 415 U.S. 724, 729, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). This would seem initially to require this Court to consider whether the burden of the present statute is indeed *de minimis*. Furthermore, the Court is troubled by the prospect that if it finds Section 17–16–8 unconstitutional, Rhode Island would be free to enact a statute with a distribution requirement which is more burdensome than the present statute yet not unconstitutional because it requires distribution by congressional districts or percentage of population. For example, a

---

**6.** Of course, once the minimum for each district was met, additional signatures in counties where the requirement had not yet been met continued to have value. Therefore a discrepancy in the value of an individual's vote may exist, a fact the Supreme Court, in affirming, may have overlooked. To this extent *Udall* may limit the broad principle announced in *Gray*.

**7.** Defendants also suggest that the Court follow *Zautra v. Miller*, 348 F.Supp. 847 (D.Utah 1972), where a three-judge court upheld a Utah requirement that new political parties secure the signatures of 500 voters, including ten from each of the state's 29 counties, in order to qualify for the ballot. However, at least two factors not present in this case existed in *Zau-*

*tra*: the distribution requirement affected new political parties only, not independent candidates such as exist here (indeed, Utah required only 300 signatures for an independent candidate), and the court found justification for the requirement in other aspects of Utah law which required political parties to operate state-wide in exchange for the state's sanctioning of primaries and recognition of party decisions concerning the selection of candidates. Here, of course, it is only the requirements for an independent candidate that are at issue. Additionally, the court in *Zautra* seems to have misunderstood the principle of equality in voting power which underlies *Moore*. *See Developments in the Law: Elections*, 88 Harv.L.Rev. 1111, 1150 n.163 (1975).

law requiring signatures from 1% of the voters in each county would require considerably more actual signatures yet might not violate the one man, one vote principle of *Moore.* Following *Udall* and *Bullock,* the Court might possibly be constrained to hold such a law imposing a proportional distribution requirement constitutional because it imposed only a slight burden in furtherance of a state interest in assuring statewide support for independent candidates, even though the actual burden was more than exists under the current statute. At least two states have enacted such laws following determinations that county distribution requirements were unconstitutional,[8] and at least one court has upheld such a statute.[9]

■ Consequently, the Court is tempted to consider the burden imposed by the present statute in evaluating its constitutionality. However, the United States Supreme Court has examined the burden imposed and has applied a less stringent standard of review only when the statute challenged did not quantitatively dilute votes. *Compare Storer v. Brown, supra,* and *Bullock v. Carter, supra, with Moore v. Ogilvie, supra, Reynolds v. Sims, supra,* and *Gray v. Sanders, supra.* Therefore this Court concludes that where the basic right of voting is diluted, it must apply a strict standard of review, no matter how insignificant the burden on access to the ballot which it creates may be.

This Court does not take a position on whether the Rhode Island distribution requirement is in fact *de minimis.* As noted earlier, the signatures of some voters are worth ten times more than those of others as a result of this requirement. The fact that McCarthy, who obtained ballot status in 29 other states, *see Nominating Petition Requirements for Third Party and Independent Candidate Ballot Access,* 11 Suff.U.L. Rev. 974, 977 n.17 (1977), was unable to fulfill the requirement also suggests that the requirement is not insignificant.

■ The right to vote is fundamental, and "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise". *Reynolds v. Sims,* 377 U.S. at 555, 84 S.Ct. at 1378. Because the right to vote is so important, a showing of infringement automatically creates a presumption that the right is burdened; such infringement "must be carefully and meticulously scrutinized". *Id.* at 562, 84 S.Ct. at 1381. Like the protection given speech under the first amendment, the right to vote—in part derived from the right of free association— [10] is given an extraordinary degree of protection.[11] Both rights are so important to the creation and preservation of a free democratic society that any restriction is enough to invoke a strict standard of review. "To

8. *See* Mich.Comp.Laws Ann. § 168.685 (Supp. 1976) (100 signatures from each congressional district); N.Y.Election Law §§ 6–136(1), –142(1) (McKinney 1978) (100 signatures from each of half of the congressional districts).

9. In *Moritt v. Governor of New York,* 42 N.Y.2d 347, 397 N.Y.S.2d 929, 366 N.E.2d 1285 (1977), *appeal dismissed,* 434 U.S. 1029, 98 S.Ct. 758, 54 L.Ed.2d 777 (1978), the New York Court of Appeals upheld a requirement that a candidate seeking a position on a primary ballot obtain 100 signatures from each of half of the state's 39 congressional districts, out of a total of 20,000 required signatures. It distinguished *Socialist Workers Party v. Rockefeller, supra,* on the grounds that distribution among congressional districts of substantially equal population, unlike distribution among counties, did not weight the signatures of voters differently and therefore did not violate the principles of *Moore.* 397 N.Y.S.2d at 931, 366 N.E.2d at 1287. Based on this conclusion, the Court

applied a less stringent standard of review. It found that the statute served a rational, legitimate state interest in assuring broad based geographical support and imposed no excessive burden on candidates.

10. *See Williams v. Rhodes,* 393 U.S. 23, 30–31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); Developments in the Law: Elections, 88 Harv.L.Rev. 1111, 1134–36 (1975).

11. *Compare, e. g., Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Street v. New York,* 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); and *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (all involving free speech), *with, e. g., Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d

the extent that a citizen's right to vote is debased, he is that much less a citizen. The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote." *Id.* at 567, 84 S.Ct. at 1384. The United States Supreme Court has held that where voting qualifications are concerned, "(t)he degree of the discrimination is irrelevant". *Harper v. Virginia Board of Elections*, 383 U.S. 663, 668, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). Accordingly, the degree of burden imposed by a statute which dilutes voting power is irrelevant.[12]

This Court therefore concludes that it cannot properly consider the extent of burden imposed by a nominating petition signature distribution requirement unless the value given to each signature is equal. Because Section 17–16–8 does quantitatively dilute votes, the principle of *Moore* is implicated and the statute can be upheld only by a showing that it promotes a compelling state interest.

However, the defendants have offered no justification at all for the distribution requirement. Indeed, in the face of *Moore*'s holding that

> [i]t is no answer to the argument under the Equal Protection Clause that this law was designed to require statewide sup-

port for launching a new political party rather than support from a few localities, 394 U.S. at 818, 89 S.Ct. at 1496.

it is difficult to conceive of *any* justification for the Rhode Island requirement, much less one significant enough to override "the equality to which the exercise of political rights is entitled under the Fourteenth Amendment". *Moore v. Ogilvie*, 394 U.S. at 819, 89 S.Ct. at 1496.

The Court concludes that the holdings of *Moore* and *Socialist Workers Party v. Rockefeller* control this case. Consequently, it holds that R.I.G.L. § 17–16–8 (1976), insofar as it requires an independent candidate for President to obtain 25 signatures in each of the state's five counties, deprives voters and independent candidates of the "equality to which the exercise of political rights is entitled under the Fourteenth Amendment", *Moore v. Ogilvie*, 394 U.S. at 819, 89 S.Ct. at 1496, and is therefore unconstitutional. The defendants are permanently enjoined from enforcing Section 17–16–8 to that extent.[13]

An order will be entered accordingly.

---

1 (1969); *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); and *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (all involving voting rights). This treatment is quite different from the United States Supreme Court's approach to state laws alleged to burden interstate commerce, where it carefully determines whether a state law effectively and substantially burdens interstate commerce before applying a strict standard of review. *See, e. g., Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959); *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). More exacting scrutiny may be given legislation allegedly restricting speech or the right to vote because such legislation "restricts those political processes which can ordinarily be expected to bring about repeal of undesirable legislation", *United States v. Carolene Products*, 304 U.S. 144, 152 n.4, 58 S.Ct. 778, 83 L.Ed. 1234 (1938) (dictum).

**12.** *De minimis* arguments similar to those raised here were rejected because of the presence of an inequality in voting power in *Socialist Workers Party v. Rockefeller*, 314 F.Supp. 984, 990 (S.D.N.Y.), *aff'd mem.* 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970).

**13.** The Court notes that § 17–16–8 also requires the signature of 25 voters from each county of the state in order to nominate independent candidates for United States Senator and Governor, 25 from each county in a congressional district to nominate independent candidates for the House of Representatives, and 10 signatures in each county to nominate independent candidates for other general state offices. Similar requirements also exist to gain ballot status in party primaries. R.I.G.L. § 17–14–7 (1970 Reenactment). Because plaintiffs have not challenged these provisions, their validity is not presently before the Court, and the Court does not rule on them at this time.