**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 16-3266

———————

CONSTITUTION PARTY OF PENNSYLVANIA;
GREEN PARTY OF PENNSYLVANIA;
LIBERTARIAN PARTY OF PENNSYLVANIA;
JOE MURPHY; JAMES N. CLYMER; CARL J.
ROMANELLI;
THOMAS R. STEVENS; KEN KRAWCHUK,
                                        Appellants

v.

**\*PEDRO A. CORTES; JONATHAN M. MARKS**
**\*** (Pursuant to Fed. R. App. P. 43(c))

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. Civil Action No. 5-12-cv-02726)
District Judge:  Honorable Lawrence F. Stengel

———————

Argued on March 22, 2017

Before: SMITH, Chief Judge, JORDAN and ROTH, Circuit
Judges

(Opinion filed: December 13, 2017)


Oliver B. Hall, Esq.                    **(Argued)**
Center for Competitive Democracy
1835 16th Street N. W., Suite 5
Washington, DC 20009

                    Counsel for Appellants


Claudia M. Tesoro, Esq.                    **(Argued)**
Office of Attorney General of Pennsylvania
21 South 12th Street
Philadelphia, PA 19107

                    Counsel for Appellee


———————————

OPINION

———————————


ROTH, <u>Circuit Judge</u>

Numerous individuals and groups, collectively known as the "Aspiring Parties,"[1] filed suit to enjoin the application of certain of Pennsylvania's election laws, arguing that those laws were unconstitutional as applied to them. They prevailed. The District Court then entered a permanent injunction, imposing county-based signature-gathering requirements that the Aspiring Parties must meet in order to appear on the ballot. The Aspiring Parties appeal once more, arguing that those requirements are an unconstitutional vote dilution scheme in violation of the Equal Protection Clause of the U.S. Constitution. We conclude that the record is inadequate to support the signature gathering requirements. For that reason, we will vacate the injunction and remand.

## I. Factual and Procedural Background

In 2012, the Aspiring Parties filed suit under 42 U.S.C. § 1983 against the Secretary of the Commonwealth of Pennsylvania and the Commissioner of the Pennsylvania Bureau of Commissions, Elections, and Legislation (the Commonwealth) in their official capacities. The Aspiring Parties claimed that certain of Pennsylvania's election laws violated their First and Fourteenth Amendment rights.

---

[1] Specifically, the Aspiring Parties consist of: the Constitution Party of Pennsylvania, the Green Party of Pennsylvania, and the Libertarian Party of Pennsylvania; their respective chairs Joe Murphy, Carl Romanelli, and Thomas Robert Stevens; James Clymer, a member of the Constitution Party; and Ken Krawchuk, a former Libertarian Party candidate for the U.S. Senate.

As we explained in greater detail in a prior opinion, political organizations, which are not classified as "major parties" under Pennsylvania law[2] and which wish to place candidates on the ballot, need to gather a considerable number of signatures; the validity of those signatures can be challenged.[3] A successful challenge may, under certain circumstances, result in an award of costs (which may be considerable).[4] The threat of being required to pay these high costs has deterred some candidates from running for office.[5]

The Aspiring Parties' suit sought to enjoin these requirements. Initially, the case was dismissed for lack of standing, but we reversed on appeal.[6] Next, the District Court held that the statutes were, in combination, unconstitutional as applied to the Aspiring Parties.[7] We affirmed and remanded the case to the District Court.[8]

On remand, the District Court requested that the Aspiring Parties and the Commonwealth each submit proposed orders which would remedy the constitutional

---

[2] Currently, only the Republican and Democratic Parties qualify as major parties.

[3] *Constitution Party of Pennsylvania v. Cortes*, 824 F.3d 386, 390 (3d Cir. 2016).

[4] *Id.* at 391.

[5] *Id.* at 392.

[6] *See Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 368 (3d Cir. 2014).

[7] *Constitution Party of Pennsylvania v. Cortes*, 116 F. Supp. 3d 486, 507 (E.D. Pa. 2015).

[8] *Constitution Party of Pennsylvania v. Cortes*, 824 F.3d 386, 399 (3d Cir. 2016)

violation. On June 17, 2016, the Aspiring Parties requested an injunction, directing that "Defendant Pedro Cortes shall place the nominees of Plaintiffs Constitution Party of Pennsylvania, Green Party of Pennsylvania and Libertarian Party of Pennsylvania on Pennsylvania's November 8, 2016 general election ballot,"[9] or, in the alternative, that the parties' candidates shall be placed on the ballot if they submit appropriate paperwork "on or before the August 1, 2016 deadline with valid signatures equal in number to the requirements imposed upon major party candidates pursuant to 25 P.S. § 2872.1 . . .."[10]

The Commonwealth responded by proposing, based on a bill then pending before the Pennsylvania General Assembly,[11] that the Aspiring Parties' candidates be placed on the ballot provided that they gather two and one-half times as many signatures as major party candidates must gather.[12]

---

[9] App. 25.

[10] App. 26.

[11] *See* H.R. 342, 200th Gen. Assemb., § 2, Reg. Sess. (Pa. 2016). This bill has passed both houses of the Pennsylvania General Assembly and was "Referred to Rules" on June 27, 2016. As of the date of this opinion, no further action had been taken. *See* http://www.legis.state.pa.us/cfdocs/legis/PN/Public/btCheck.cfm?txtType=PDF&sessYr=2015&sessInd=0&billBody=H&billTyp=B&billNbr=0342&pn=3618. Related legislation amending the Pennsylvania Election Code was recently introduced by the same Representative who had introduced House Bill 342. *See* H.R. 444, 201st Gen. Assemb., Reg. Sess. (Pa. 2017).

[12] App. 29-30.

As for the county signature requirements, this bill provided that, for the office of Governor, at least 5,000 signatures must be gathered to include at least 250 from at least 10 counties. (In Pennsylvania, there are the 67 counties). For other state-wide offices, this bill required between 1,250 and 2,500 signatures with at least 250 from at least 5 counties.[13]

Between June 21 and 28, 2016, the District Court held five off-the-record status conferences. At those status conferences, the Aspiring Parties suggested that the county-based signature-gathering requirements in the Commonwealth's proposed order were unconstitutional vote

---

[13] In this bill, the offices of President of the United States and United States Senator required 5,000 signatures without a county-based distribution requirement.

6

dilution schemes in violation of the Fourteenth Amendment.[14] Both parties submitted letter briefs outlining their positions on that issue.

On June 30, 2016, the District Court adopted the Commonwealth's proposed order. The District Court did not find any facts, nor did it explain its decision. The Aspiring Parties have appealed, arguing again that the county-based signature-gathering requirements in the District Court's order are unconstitutional.

---

[14] This position may seem to contradict the Aspiring Parties' request that their candidates be placed on the ballot if they submit papers with "signatures equal in number to the requirements imposed upon major party candidates." App. 26. At oral argument, counsel explained that the proposed order was intended to require the Aspiring Parties to match the total number of signatures required for major parties but not the county-based distribution requirements. Oral Arg. Recording at 4:42-5:07. The record does not reveal whether the District Court initially interpreted the Aspiring Parties' proposed order in this way. However, within a few days of submission of the proposed orders, the District Court held status conferences with the parties, and the Aspiring Parties submitted a letter brief opposing the county-based signature-gathering requirements. Thus, we believe there was no waiver here; the District Court was informed of the Aspiring Parties' views within an appropriate amount of time.

## II. Discussion[15]

### A. Standard of Review

Our review of the constitutionality of the District Court's injunction is plenary.[16]

### B. County-Based Signature Requirements

The question of the constitutionality of county-based signature-gathering requirements has a long history. Over the course of three opinions in the early 1960's, the Supreme Court articulated the principle of "one person, one vote" contained in the Equal Protection Clause.[17] The essence of this principle is that each voter's vote must be counted equally. Observing that the Fifteenth and Nineteenth

---

[15] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. While conceding jurisdiction under § 1331, the Aspiring Parties argue that the District Court did not have jurisdiction to enter the injunction on appeal here because it reached issues not properly before it. This argument lacks merit. The District Court had found a constitutional violation and had jurisdiction to fashion a remedy. *See Consumer Party v. Davis*, 778 F.2d 140, 146 (3d Cir. 1985) (observing that a district court has wide, although not infinite, discretion to fashion a remedial injunction).

[16] *Ne. Women's Ctr., Inc. v. McMonagle*, 939 F.2d 57, 66 (3d Cir. 1991).

[17] *Reynolds v. Sims*, 377 U.S. 533 (1964); *Gray v. Sanders*, 372 U.S. 368 (1963); *Baker v. Carr*, 369 U.S. 186 (1962).

Amendments protect the rights of people of different races and sexes to vote, the Supreme Court reasoned:

> If a State in a statewide election weighted the male vote more heavily than the female vote or the white vote more heavily than the Negro vote, none could successfully contend that that discrimination was allowable. How then can one person be given twice or 10 times the voting power of another person in a statewide election merely because he lives in a rural area or because he lives in the smallest rural county? Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment.[18]

Thereafter, in *Moore v. Ogilvie*, the Supreme Court applied this principle to requirements that candidates who wished to have their names placed on the ballot gather a minimum number of signatures from a specified number of counties in a state.[19] In *Moore*, Illinois required that a candidate, who wished to appear on the ballot, gather signatures from at least 25,000 qualified voters, including at least 200 qualified voters from each of at least 50 counties in

---

[18] *Gray*, 372 U.S. at 379 (citation omitted).
[19] 394 U.S. 814 (1969).

the state.[20]   At the time, "93.4% of the State's registered voters reside[d] in the 49 most populous counties, and only 6.6% [were] resident in the remaining 53 counties."[21] Because "the electorate in 49 of the counties which contain 93.4% of the registered voters [might] not form a new political party and place its candidates on the ballot," but "25,000 of the remaining 6.6% of registered voters properly distributed among the 53 remaining counties [might] form a new party to elect candidates to office[,]" this requirement "discriminate[d] against the residents of the populous counties of the State in favor of rural sections" in violation of the "one person, one vote" principle.[22]

Subsequently, *Anderson v. Celebrezze* set out a process for resolving constitutional challenges to state election laws.[23] Under *Anderson*, a court

> must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.  It then must identify and evaluate the precise interests put forward by the State as justifications for the

---

[20] *Id.* at 815.

[21] *Id.* at 816.

[22] *Id.* at 819.   While the requirements at issue involved gathering signatures of voters rather than casting votes, the Court held that "[a]ll procedures used by a State as an integral part of the election process must pass muster against the charges of discrimination or of abridgment of the right to vote." *Id.* at 818.

[23] 460 U.S. 780 (1983).

burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.[24]

While *Anderson* specifically involved the right to free association under the First Amendment, this Court has applied the *Anderson* analysis to Equal Protection challenges as well.[25]

Both before and after *Anderson*, county-based signature-gathering requirements have fared poorly in the courts. At least three different circuit courts, seven district courts, and one state supreme court have all held in reported decisions that a state's county-based signature-gathering

---

[24] *Id.* at 789.

[25] *Belitskus v. Pizzingrilli*, 343 F.3d 632, 643 (3d Cir. 2003); *accord Blomquist v. Thomson*, 739 F.2d 525, 527 (10th Cir. 1984).

requirements were unconstitutional.[26] The essential difficulty that a state faces in justifying a county-based signature-

[26] *See Am. Civil Liberties Union of Nevada v. Lomax*, 471 F.3d 1010, 1012, 1020 (9th Cir. 2006) (striking down a requirement of signatures from 10% of voters in 13 of Nevada's 17 counties); *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073, 1075 & n.3, 1077 (9th Cir. 2003) (6% of voters in 22 of Idaho's 44 counties); *Blomquist v. Thomson*, 739 F.2d 525, 528 (10th Cir. 1984) (8,000 voters from 2 of Wyoming's 23 counties); *Communist Party of Illinois v. State Bd. of Elections for State of Ill.*, 518 F.2d 517, 518, 521 (7th Cir. 1975) (25,000 voters, of which not more than 13,000 could be from any one of Illinois's 102 counties); *Montana Pub. Interest Research Grp. v. Johnson*, 361 F. Supp. 2d 1222, 1224-25, 1229-30 (D. Mont. 2005) (5% of voters in at least half of Montana's 56 counties); *Libertarian Party of Nebraska v. Beermann*, 598 F. Supp. 57, 60 (D. Neb. 1984) (1% of voters in 19 of Nebraska's 93 counties); *McCarthy v. Garrahy*, 460 F. Supp. 1042, 1050 (D.R.I. 1978) (25 signatures in 5 of Rhode Island's 5 counties); *Baird v. Davoren*, 346 F. Supp. 515, 522 (D. Mass. 1972) (3% of voters in the last gubernatorial election, of which no more than one-third from one of Massachusetts's 14 counties); *Socialist Labor Party v. Rhodes*, 318 F. Supp. 1262, 1272 (S.D. Ohio 1970) (200 voters from 30 of Ohio's 88 counties), *aff'd sub nom. Sweetenham v. Gilligan*, 409 U.S. 942 (1972); *Socialist Workers Party v. Rockefeller*, 314 F. Supp. 984, 989-991 (S.D.N.Y.) (50 voters from 62 of New York's 62 counties), *aff'd*, 400 U.S. 806 (1970); *Socialist Workers Party v. Hare*, 304 F. Supp. 534, 535-36 (E.D. Mich. 1969) (100 voters from 10 of Michigan's 83 counties); *Gallivan v.*

gathering requirement under *Moore* and *Anderson* is that, in the final step of *Anderson*—"consider[ing] the extent to which [the state's asserted] interests make it necessary to burden the plaintiff's rights"[27]—alternatives to county-based requirements are readily available. Typically, the state's justification for county-based signature-gathering requirements is to keep frivolous candidates off the ballot by requiring that a candidate show some support across a significant portion of the state.[28] However, signature-gathering requirements based on geographical units other than counties may serve that interest just as well. For example, congressional districts must have populations that are "as nearly as practicable" equal in population;[29] thus, requiring a minimum number of signatures to be gathered from different congressional districts serves the interest of requiring candidates to show support across different geographical areas but does not dilute anyone's voting power.[30] Hence, it

---

*Walker*, 54 P.3d 1069, 1095-96 (Utah 2002) (10% of voters from 20 of Utah's 29 counties).

[27] *Anderson*, 460 U.S. at 789.

[28] *See, e.g.*, *Moore*, 394 U.S. at 818 (considering the argument that "this law was designed to require statewide support for launching a new political party rather than support from a few localities").

[29] *Kirkpatrick v. Preisler*, 394 U.S. 526, 530-31 (1969).

[30] Numerous courts have approved of such an approach. *See, e.g.*, *Angle v. Miller*, 673 F.3d 1122, 1129 (9th Cir. 2012); *Libertarian Party v. Bond*, 764 F.2d 538, 544 (8th Cir. 1985); *Libertarian Party of Virginia v. Davis*, 766 F.2d 865, 868 (4th Cir. 1985) (abrogated on other grounds as recognized in *Lux v. Judd*, 651 F.3d 396 (4th Cir. 2011)).

is rarely, if ever, necessary to impose county-based signature-gathering requirements that significantly burden voting rights.

However, not all county-based signature-gathering requirements are sufficiently stringent to cause constitutional concern. As courts, beginning with a district court in *Zautra v. Miller*, have held, county-based signature-gathering requirements are constitutional when such requirements have no "real or appreciable impact upon the franchise . . .."[31] In *Zautra*, Utah required that "new political associations . . . secure the signatures of 500 registered voters, including at least ten signatures of registered voters from each of ten counties, in order to qualify as a political party with the accompanying right to place candidates on the ballot."[32] Crucial to the finding that there was no appreciable impact was the fact that the number of signatures required from each county was only ten. Ten signatures from ten counties was small by any measure; for example, the district court observed that one hundred geographically distributed signatures in Utah amounted to only about one-ninth as many signatures per one million population as did the comparable requirement in *Moore*.[33] The ten-county requirement was also a lesser burden than the comparable requirement in *Moore*, and fulfilling the county-based signature-gathering requirement was not the only way to place a candidate's name on the ballot in Utah (although it had been in Illinois in *Moore*).[34] Because of these considerations, *Zautra* held that the requirement was constitutional because it exerted no

---

[31] 348 F. Supp. 847, 850 (D. Utah 1972).

[32] *Id.* at 848.

[33] *Id.* at 849 & n.3.

[34] *Id.* at 849-50.

appreciable impact on the franchise. While *Zautra* was decided before *Anderson*, it is consistent with the *Anderson* analysis: If there is no appreciable impact on the franchise, then there is no injury to constitutional rights that the court must balance against a state's interests. The state's interests simply prevail.

*Zautra* illustrates the importance of considering the real-world impact of voting rights restrictions. This Court has also emphasized this point, noting that under *Anderson*,

> the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. When those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance. However, when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.[35]

Because this inquiry is concerned with the extent to which a challenged regulation *actually* burdens constitutional rights, this inquiry is "fact intensive."[36] It requires on-the-

---

[35] *Belitskus*, 343 F.3d at 643 (internal quotation marks, brackets, and citations omitted).

[36] *Patriot Party of Allegheny Cty. v. Allegheny Cty. Dep't of Elections*, 95 F.3d 253, 258 (3d Cir. 1996).

record analysis of the facts pertaining to the particular restriction under scrutiny. Such facts include the number of counties in the state at issue, the distribution of voters throughout those counties, and any other indications of the magnitude of vote dilution that will take place under the challenged restriction. A requirement that allows a minority of the population to thwart the majority's will, as did the requirement in *Moore*,[37] certainly has an appreciable impact, but even lesser requirements may have an appreciable impact depending on the factual circumstances surrounding the requirements.

## C. The District Court's Injunction

Under these standards, the District Court's order must be vacated. We recognize that the District Court was working under significant time pressure; this Court issued its affirmance in June 2016 when the campaign season had already begun. As a result, the District Court needed to work as quickly as possible in order to provide fair relief to the parties. Nonetheless, the District Court did not make any factual findings or provide any explanation on the record of the factors it considered in determining that its injunction was appropriate. Because resolving vote dilution challenges is a fact intensive process and because county-based signature-gathering requirements have been held to be constitutional only when they have been shown to have no appreciable

---

[37] If the 6.6% of the registered voters who lived in the least-populous counties in Illinois withheld their signatures, they could block candidates from being placed on the ballot. *See Moore*, 394 U.S. at 819.

impact on the franchise, the lack of fact-finding requires that we vacate the District Court's order.

The District Court may determine to enter the same order again—or to issue another injunction containing county-based signature-gathering requirements. However, the court must first conclude, after considering the factors and finding facts, that the restrictions are constitutional under *Anderson*. Given the justification for these requirements that the Commonwealth has presented,[38] the District Court can impose the county-based signature-gathering requirements if it concludes that the requirements would have no appreciable impact on voting rights.[39] The court did not so conclude here, and we have no basis in the record to reach such a conclusion independently.

---

[38] The Commonwealth has suggested in its brief that the county-based signature-gathering requirements are necessary for a minor party to show "some modicum of support" before a minor party candidate can be placed on the ballot.

[39] The Commonwealth observes that Pennsylvania state courts, citing *Zautra*, have held that the county-based signature-gathering requirements for major-party candidates are constitutional because they have no appreciable impact on the franchise. *See Petition of Berg*, 713 A.2d 1106, 1109 (Pa. 1998); *Cavanaugh v. Schaeffer*, 444 A.2d 1308, 1311-12 (Pa. Commw. Ct. 1982). While the Commonwealth is correct that the state courts have so held, the requirements here involve two and one-half times as many signatures. Thus, even if the impact of the lesser requirements for major-party candidates is negligible—an issue not before this Court and one about which we express no opinion—the greater requirements here still must be analyzed separately.

### III. Conclusion

For the foregoing reasons, we will vacate the District Court's judgment and remand for further proceedings consistent with this opinion.