**KENTUCKY STATE BAR ASSOCIATION,**
Complainant,

v.

Daniel T. TAYLOR, III, Respondent.

Court of Appeals of Kentucky.

June 30, 1972.

Charles L. Hobson, Frankfort, C. Gibson Downing, Jr., Lexington, for complainant; Charles S. Cassis, Gen. Counsel, Ky. State Bar Assn., Eli H. Brown, IV, Louisville, of counsel.

Robert Allen Sedler, Lexington, William M. Kunstler, Morton Stavis, Arthur Kinoy, Doris Peterson, New York City, Catherine G. Roraback, Bonnie Brower, Jeremiah S. Gutman, New York City, Neville M. Tucker, Louisville, Dean A. Robb, Suttons Bay, Mich., Sanford M. Katz, New York City, William H. Allison, Jr., Louisville, for respondent; Dennis J. Roberts, Michael Kennedy, Joseph Rhine, Michael Tigar, San Francisco, Cal., Philip J. Hirschkop, Alexandria, Va., Percy L. Julian, Jr., Madison, Wis., Tobias Simon, Miami, Fla., of counsel.

PALMORE, Judge.

This disciplinary matter is before us on a recommendation that the respondent, Daniel T. Taylor, III, be suspended from the practice of law in this state for five years.

As in the case of Kentucky State Bar Association v. Stivers, Ky., 475 S.W.2d 900 (1971), the proceedings were conducted under the rules in force prior to the amendments of July 2, 1971.[1] They originated on July 19, 1968, in the form of a charge signed by the president and by the executive director of the association setting forth nine separate allegations of unethical conduct and recommending permanent disbarment. A three-man trial committee appointed by the president of the association thereafter conducted hearings in which the respondent and his counsel participated. The trial committee found the respondent guilty on all but Count 6 but found also that there were extenuating circumstances with respect to several of the other counts and recommended a one-year suspension. RCA 3.400. After its review of the trial committee's report the Board of Governors found the respondent guilty under all but Counts 4 and 6 and recommended a five-year suspension. RCA 3.420.

Though not in the order presented in his brief, the respondent's arguments are:

1. That this court is not presently constituted in accordance with § 116 of the Kentucky Constitution and the "one man, one vote" principle of the equal protection clause of the 14th Amendment to the United

---

[1]. All citations of the Rules in this opinion refer to the rule numbers as they were before July 2, 1971.

States Constitution, for which reason it does not have the authority to deal with this or any other case now before it.

2. That this proceeding was brought for the purpose of discouraging and inhibiting the representation of controversial and unpopular clients.

3. That important procedural rights of the respondent were violated by denial of a public hearing and of the right to question members of the trial committee as to their possible bias.

4. That the imposition of the costs of the proceeding upon the respondent, if he is unsuccessful in defense of the charges, violates due process of law. Cf. RCA 3.-520.

5. That the evidence does not support the charges.

6. That the recommended punishment is disproportionate to the charges.

Our opinions with respect to each of these points follow:

■■■■ *Point 1.* HB 567, enacted at the 1972 regular session of the General Assembly and duly signed by the Governor, established new appellate court districts which comply with the "one man, one vote" principle except for the Fourth District, which consists of Jefferson County. Const. § 116 requires that the state be divided "by counties" into appellate court districts, which in our opinion forbids the splitting of any county between two or more districts. Therefore, this court is now constituted as nearly in accordance with our own constitution as it can be. Conceding arguendo that it may not have been so constituted before the 1972 redistricting enactment, and that the incumbent judges have not been elected from the new districts, certainly there is no authority for the proposition that it must cease functioning, abandoning its vast inventory of public work to drift

rudderless at sea until a transition to the new districts has been fully consummated.

There is dictum in Hadley v. Junior College District, 397 U.S. 50, at p. 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) from which it can be argued that under the Equal Protection Clause of the 14th Amendment the "one man, one vote" principle applies to any public body whose members are elected by districts. In the same opinion, however, it is recognized that there may be some governmental agencies to whose work the matter of apportionment is not relevant. Thus far the prevailing view has been that the courts fall in this category. See Stokes v. Fortson, 234 F.Supp. 575, 577 (N.D.Ga. 1964); Buchanan v. Rhodes, 249 F.Supp. 860 (N.D.Ohio 1966); New York State Ass'n of Trial Lawyers v. Rockefeller, 267 F.Supp. 148 (S.D.N.Y.1967); Kail v. Rockefeller, 275 F.Supp. 937 (E.D.N.Y.1967); Sullivan v. Alabama State Bar, 295 F.Supp. 1216, 1222 (M.D.Ala.1969).

■■■■ It is our opinion that the "one man, one vote" principle should not and does not apply to the judiciary. In any event, unless and until it be determined by the United States Supreme Court that the federal constitution dictates otherwise we are bound to comply with our own state constitution.

■■■■ *Point 2.* The assertion that this proceeding is a bad-faith attempt to suppress the representation of controversial and unpopular clients is simply a wild conclusion drawn from speculation and surmise. Apparently it is based upon a theory that the case against the respondent is so devoid of merit that there must be some other reason for its prosecution, the most probable of which would be that he represents a type of client the Brahmins of the bar disapprove. There is however, nothing in the record, or in the record of the federal court case in which the respondent has sought to enjoin the association, to support such a conclusion.[2] Indeed, it occurs to us

2. See Taylor v. Kentucky State Bar Association, 424 F.2d 478 (6 Cir. 1970). Upon subsequent hearing the District Court denied relief, and the Circuit Court of Appeals has denied a motion for injunctive relief pending a second appeal.

that this particular contention may be less designed to help the respondent than it is to cast doubt on the integrity of the organized bar.

■ *Point 3.* The respondent's motion that the hearings before the trial committee be open to the public was denied by the committee because RCA 3.350 provided that the proceedings "shall not be public" and that the record shall remain confidential to all but the parties and the court unless and until guilt be finally adjudged. The members of the committee declined to be interrogated with respect to their qualifications to sit.

We fully appreciate the principle of public trial. There is, however, an erroneous tendency today to equate all rights with those that are guaranteed to a defendant in a criminal prosecution, and we are not convinced that a public trial is necessary in a disciplinary inquiry conducted by the bar association. Publicity cuts both ways. Sometimes the desirability of having it is outweighed by the desirability of protection from it, as in juvenile matters. Usually it is the respondent himself whose protection from it is sought in a disciplinary case, but quite often there are others whose protection is equally important. In this instance, for example, it developed that one of the principal witnesses, a circuit judge, was about as much on trial as the respondent was. Under the circumstances we cannot say that public hearings would have been desirable, and we have not been referred to any authority holding that they may be required as a matter of right.

RCA 3.310 provided a method of challenging members of the trial committee for the same causes that would apply to a circuit judge, but the respondent claims that he was unable to do this because he did not know the names of the committee members until too late and for that reason should have been permitted to interrogate them in voir dire fashion, as we held that a teacher may do with respect to the members of a school board which has charged

him with misconduct. Cf. Osborne v. Bullitt County Board of Education, Ky., 415 S.W.2d 607 (1967).

■ It is not seriously contended that such an interrogation in this case actually would have disclosed any prejudice on the part of the committee members, and there are significant differences between this and the *Osborne* case. In *Osborne* the school board was the accuser and the judge. In this case the trial committee was not the accuser and is not the judge. Its ultimate function was advisory only. The impartiality of an advisory tribunal is important by reason of its control of the trial rather than its power to recommend. Whatever weight its ultimate recommendation has in this court depends entirely on the record made before it, cf. Kentucky State Bar Association v. Stivers, Ky., 475 S.W. 2d 900, 904 (1971), and a careful study of that record discloses no indication whatever that the committee did not conduct the hearings fairly and honestly.

In summary, we hold that the respondent was not prejudiced by the denial of a public trial and the opportunity of questioning the members of the committee.

■ *Point 4.* The argument that the assessment of costs against a respondent, if he is found guilty, violates due process relies on the decisions of the United States Supreme Court and of this court holding that the trier of a case cannot have a financial interest in the outcome. Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); Wagers v. Sizemore, 222 Ky. 306, 300 S.W. 918 (1927); Roberts v. Noel, Ky., 296 S.W.2d 745 (1956); Asher v. Mills, Ky., 421 S.W.2d 78 (1967). We do not have that situation here. Neither the members of the trial committee nor of the Board of Governors receive any part of the costs. Although they represent the bar association in the proceeding, they do so in the same sense that the officers of a court represent the state. It is no more a denial of due process when the bar association recovers its costs than it is when the state does so

in criminal proceedings conducted by its courts.

*Point 5.* We now come to the facts of the case. Since Counts 1 through 5 involve conduct during the trial of one case and the evidence pertaining to them occupies a major portion of the record the other counts will be taken first.

*Count 6* had to do with the alleged neglect and abandonment of a case in which the respondent had been employed. The board having found him not guilty, it needs no further mention.

*Count 7* is that on May 4, 1967, the respondent committed assault and battery upon an assistant city attorney of the City of Louisville "without cause or provocation." [3] The supporting facts are so closely related to *Count 9* that they may as well be treated together.

*Count 9* is that on May 4, 1967, the respondent intimidated and threatened a witness with legal action, in violation of Canon 18.[4]

The facts of *Counts 7* and *9* are as follows:

Shortly before May 4, 1967, Judge William Colson, judge of the Louisville Police Court, had ordered the respondent (whom we shall hereinafter call by his name) to jail for contempt of court following an incident in which several of his clients, while appearing before the bench as defendants in Judge Colson's court, had burst forth in song.[5] A young lady named Kathleen Arnold, a reporter for the Louisville Courier-Journal, wrote an account of the incident which appeared in the newspaper. In it she said that Taylor stood mute, or failed to answer, when Judge Colson asked whether he had directed his clients to commit this impropriety. Anyway, in order to

get out of jail Taylor brought a habeas corpus action which was heard by one of the judges of the Jefferson Circuit Court, and in which Miss Arnold appeared as a witness. After the hearing Taylor asked to speak to her in the hallway outside the courtroom. When they reached the hallway, she says, Taylor appeared to be quite agitated, and asked if she was the reporter who had written the newspaper story, to which she replied that she was. Taylor then accused her of some discrepancy between what she had written in the news story and what she had said as a witness in the habeas corpus hearing. According to Miss Arnold, "He told me that he was going to have me brought before the Court for libel, slander, defamation of character and perjury because of this discrepancy which I never did understand."

At about this time John Tim McCall, a young assistant city attorney, who also had left the courtroom and was waiting in the hallway for an elevator, walked over and told Miss Arnold "that you don't have to listen to this stuff." We continue with McCall's testimony:

"At that time she said that, in so many words, she was big enough to take care of herself and for me to get out of the way, you know, she could take care of herself. At that point, I started walking away and Mr. Taylor said something about using punk language. That I was a punk, that I shouldn't be interfering. I walked away . . . At that point Mr. Taylor again started talking about . . . I remember one statement he made. He said if you make one step towards me I'll knock you all the way into Jefferson Street . . . I didn't think at the time that he could do it, but I didn't say anything. I probably did exchange some comments with him and as the elevator came up, came back up, we were

---

3. The formal charge does not specify which of the Canons of Ethics was violated, but see In re Vaughn, Ky., 369 S.W.2d 14 (1963).

4. Canon 18 provides that a lawyer "should always treat adverse witnesses and suit-

ors with fairness and due consideration," etc.

5. In some places they have singing waiters. In Louisville, upon this occasion, they had singing defendants.

waiting on the tenth floor for the elevator, we exchanged comments and at that point he said something to me and I called him an asshole. I had books in one hand and a briefcase in the other hand and as I got ready to get on the elevator, as near as I can tell Mr. Taylor hit me in the back and I turned around, I don't know if I hit him with my forearm or with my fist or what but he hit the floor and suffered a convulsion. I think his head hit the floor, he had a knot on his head.

"As far as I'm concerned it was partly my fault, it was not all Mr. Taylor's fault."

Following this incident Taylor wrote letters of apology to both McCall and Miss Arnold.

At the time Taylor accosted Miss Arnold in the hallway the habeas corpus proceeding had terminated adversely to Taylor and he had been instructed to report to the jail at 6:30 P.M. for the purpose of serving out the 6-hour contempt penalty assessed by Judge Colson.

*Count 8* is that Taylor "on numerous occasions, in the Police Court of Louisville, Kentucky, presented a person other than the defendant when the defendant was called, when the person so presented was not the defendant," in violation of Canon 22.[6] Though it was alleged that Taylor had engaged in this conduct on numerous occasions, the evidence suggested only one such event, which was as follows:

On April 29, 1967, some 480 defendants appeared before Judge Colson in the police court following wholesale arrests in connection with "open housing" demonstrations in Louisville. They were represented by five or six lawyers (described in the newspaper as a "phalanx of lawyers") of whom Taylor was one. Some were tried singly and some in groups. The courtroom was jammed. At the beginning of the proceedings the attorneys had moved the court to allow them to bring up the defendants in large groups and require the arresting officers to identify the individual defendants against whom they had placed charges. The court's ruling on these motions was thus described in the testimony of the city prosecuting attorney:

Q—"And what had the Court's ruling been?"

A—"Well, it was said that we try them individually or in small segments and we were not going to have an identity or try to pick the defendant out at the time."

Q—"In other words, the court had already ruled on this particular day and before the Cowden case[7] was tried and in a case or one or more cases in which Mr. Taylor was involved, that the court would not permit multiple defendants or multiple people there and require the police officers to pick the defendant out, is that correct?"

A—"That's correct."

When Cowden's case was called for trial Taylor moved to the area in front of the bench, accompanied by a young man. Officer Bramble, the prosecuting witness, recognized at once that this young man was not the defendant, and said so to the prosecuting attorney. Upon overhearing the officer's conversation with the prosecutor Judge Colson asked Taylor if this was the defendant on trial, to which Taylor replied something to the effect that "we are ready for trial," or, as the prosecutor testified, that "he is in the courtroom." Whatever were the exact words, all of the witnesses agree that Taylor did not represent to Judge Colson that the person with him was the defendant. Judge Colson then told Taylor to produce the defendant or he would order his bail bond forfeited. Shortly thereafter Cowden emerged from the crowd and his case proceeded to trial.

---

6. Canon 22 demands "candor and fairness" in the conduct of a lawyer before the courts.

7. One of Taylor's clients was named Frederick Cowden.

Judge Colson testified that he "did not like" what had happened but saw nothing improper in it. His impression of Taylor's purpose was as follows:

Q—"With regard to the charge that Mr. Taylor entered a substitute defendant in your court, at any time during the episode that took place on that particular day, did you come up with the impression or the conclusion that Mr. Taylor was trying to perpetrate a fraud on your court?"

A—"No, I didn't. As a matter of fact I had the opposite conclusion. Had I thought he was trying to perpetrate a fraud on my court I would have put him in jail right then for contempt."

Q—"What was his purpose?"

A—"I don't know. I can only guess and assume that he was trying to confuse the prosecution witness from the standpoint of the definity [sic] of the defendant. That is what I assumed at the time."

Q—"At any time—incidentally how long have you known Mr. Taylor?"

A—"Well, 15 years, I assume."

Q—"Well, at any time since you have been on the bench with the exception of tactics, such as what we're talking in this matter, have you ever had any occurrence or anything that would ever make you question the ethics of Mr. Taylor either as a lawyer or a human being?"

A—"No, I have never questioned Mr. Taylor's honor or integrity. As you mentioned I have questioned his tactics. I have had my problems with Mr. Taylor and I held him in contempt of court on probably two or three occasions on tactics. Not for fraud or misrepresentation

or lying or anything else. I have never had any question. As a matter of fact I think he is an honest man and a man of integrity."

The prosecuting attorney also testified that he had opposed Taylor in a great many cases:

Q—"And in any of that time in your association with him in this capacity, have you ever known him to represent to a court anything that was not so?"

A—"No. I mean, Dan is a—an aggressive lawyer and attempts to defend his clients. And I always consider him a very worthy opponent in this capacity. But I have never known him to misrepresent anything to the Court."

Counts *1* to *5* are that during the first trial of Commonwealth v. Kermit Ray Geary and Doyal Randall Geary in the Jefferson Circuit Court before the late Judge J. Miles Pound, Taylor (1) on April 29, 1968, within the view and hearing of the jury disrespectfully remonstrated with the judge and "exploited matters unrelated to the trial of the case and not affecting the merits of the pending cause," in violation of Canon 1;[8] (2) on May 2, 1968, within the view and hearing of the jury, falsely accused the judge of calling him a "dirty son-of-a-bitch," exceeding the bounds of Canons 5 and 15;[9] (3) on May 3, 1968, within the view and hearing of the jury, charged the judge with threatening to fine him and otherwise addressed disrespectful language to the judge concerning his action in other cases, in violation of Canons 1 and 22;[10] (4) on May 3, 1968, within the view and hearing of the jury, falsely accused the judge of being under disability from the use of medicine or alcohol, in violation of

---

8. Canon 1 states that it is the lawyer's duty "to maintain towards the Courts a respectful attitude," etc.

9. Canon 5 limits the lawyer defending in a criminal case to the use of "fair and honorable means." Canon 15 denounces the use of "fraud or chicane" or the setting up of a false claim in order to win his client's cause.

10. Among other things in addition to requiring "candor and fairness" of the lawyer in his conduct before the court, Canon 22 says that the lawyer should not, in addressing the court, make statements intended to influence the jury or bystanders.

Canons 1, 15 and 22; and (5) at various times during the trial, in an effort to obtain a mistrial, violated the confidence of the court by revealing to the jury statements made by the judge for the record and out of the jury's hearing, in violation of Canons 15 and 22.

Kermit and Doyal Geary were being tried for the murder of one policeman and the wounding of another. The trial extended over a period of five or six days and ended with a "hung jury." [11] With a view toward getting the jurors out of the hotel so it could honor its reservations for customers arriving to attend the Kentucky Derby on May 4, the court held night sessions, a background circumstance we mention as relevant because it is quite evident that as the trial wore on both Taylor and the presiding judge showed the effects of great strain. Taylor conducted the defense alone.

The first incident (Count 1) arose during voir dire examination of the prospective jurors when the court refused Taylor's request to have a courtroom door closed so that the questions and answers might be heard better. Judge Pound called Taylor to the bench and told him in a low voice that he was holding him in contempt and would deal with him later, whereupon Taylor moved away and insisted, within the hearing of the jury, that if he was going to be held in contempt it should be done right now, that he did not want to go through the trial with a sword over his head, etc. Shortly thereafter court was adjourned for the day, and on the next morning Judge Pound and Taylor had an amicable discussion out of the presence of the jury in which the judge absolved Taylor of contempt, observing that "we all get hot under the collar at times," and Taylor expressed his gratitude and assured the judge that he would "try to conduct himself as he should."

The second incident (Count 2) occurred when, immediately following some damaging testimony elicited by the Commonwealth from a brother of the defendants, Taylor approached the bench and asked that "the record show that the trial judge was just shaking his head from side to side," and then, after the judge interposed the word "Look," asked that "the record further show that the trial judge just said to the defense lawyer, 'You dirty son-of-a-bitch.'"

This is the most serious of the Geary trial incidents giving rise to the charges of professional misconduct. Judge Pound denied having made such a remark and immediately questioned the court attachés, jurors, and nearby newspaper reporters as to whether they had heard him say it. If he did, no one heard it but Taylor, who was of course looking directly at him. Only one witness testified in the instant proceeding that the judge made the statement. This was a friend of Taylor who was present at the trial as a spectator. He did not actually hear, but said that it appeared from the movement of Judge Pound's lips that he did call Taylor a "son-of-a-bitch". Unquestionably, however, Taylor's statement that the judge had done so was heard by all present, including the jury. Taylor continued to insist that Judge Pound had uttered the remark in question, and so testified in this proceeding. Judge Pound testified categorically to the contrary.

The third incident (Count 3) did not, as alleged in the formal charges against Taylor, occur in the presence of the jury. During the evening or supper recess on May 2 Taylor evidently collapsed in his office from exhaustion and strain and was unable to return to the courtroom to resume the trial. Some lawyer friends of Taylor summoned a physician and reported the situation to Judge Pound. The judge's re-

---

11. At a subsequent trial Kermit Geary received a sentence of death and Doyal Geary was sentenced to life imprison-

ment. The judgments were affirmed in Geary v. Com., Ky., (March 7, 1972, pet. reh. overruled May 12, 1972.)

action was that the illness was feigned for the purpose of precipitating a mistrial, and he remarked to the newspaper reporters in attendance that it was an example of "shysterism." In order to avoid a mistrial in the event Taylor should be unable to continue on the next morning he appointed three lawyers to represent the Geary brothers. Meanwhile, the physician who had been called for Taylor appeared in court, reported his condition, and indicated that with some rest and nourishment Taylor should feel better and probably would be able to continue with the trial in the morning. The doctor later testified that at this time the judge appeared to be intoxicated or under the influence of drugs.

Taylor did return the next morning, and the incident in question occurred during his efforts to have the other three lawyers relieved of their appointment to participate in the defense. In declining to relieve them Judge Pound explained that he wanted them to be there in case Taylor got sick again, to which Taylor responded in the following vein:

> Mr. Taylor: "And it also would be very convenient if your Honor should decide that Mr. Taylor should go to jail in the middle of the trial, wouldn't it? I suggest—"

> The court: "(Interrupting) Don't forget about this Court, he would never do a thing like that."

> Mr. Taylor: "Fine, fine. And I hope he won't fine Mr. Taylor $25.00 in the middle of the trial, which has occurred previously many times."

This exchange was followed very shortly by the fourth incident (Count 4),[12] in which Taylor, while moving for a mistrial, said the following:

> "My motion that the trial judge declare a mistrial, discharge the jury and reassign these causes for trial, is based on the obvious inability of the trial judge to continue this case in a fair and impartial and dispassionate manner, as he is charged, both under the law and both morally and legally.

> "I submit that the record and the occurrences, some of which, unfortunately for the defendant, are not portrayed on tape, which—uh—which preserves only sound, has been of such a type as to clearly indicate that the trial judge is suffering from some type of disability, be it either the use of medicine or the use of alcohol."

The fifth incident, or series of incidents (Count 5), is mainly a different facet of the first, in which Taylor, after being advised that he was being held in contempt following the door-closing exchange, in effect announced it to the prospective jurors. In addition, the court reporter testified that during a recess on the third day of the trial she had overheard Taylor remark to two unidentified lawyers at the drinking fountain "that he might just as well declare a mistrial now, because he was going to before it was over with. And that was—they sort of laughed."

We come now to an analysis of the case on its merits.

 It should be recognized that with the exception of Count 2 (the "son-of-a-bitch" incident) the facts are virtually undisputed, the real question in each instance being whether they reflect a violation or violations of the applicable canons, which is more a question of law than of fact. If the canons of ethics adopted for the legal profession were tested under the "void for vagueness" doctrine which has spelled the doom of various breach of peace and disorderly conduct laws throughout the country it is doubtful that they would survive this case. What is "fair and honorable," "a respectful attitude," "candor and fairness," or "chicane" must depend very largely on the subjective point of view of the person or persons making a judgment after the fact. Obviously we do not all have the

---

12. The Board of Governors found the respondent not guilty under *Count 4*.

same sense of propriety. It is interesting to note, for example, the chairman of the trial committee's comment that "you all live in a legal jungle down here." It may well be that the standard of decorum usually prevailing in the sedate precincts of chancery should also be observed by the jungle-fighters in the pit of police and criminal courts, but it would be somewhat less than realistic to assume that the advocate who practices exclusively in one of these two worlds will have the same conception of what is expected of him as the lawyer who confines his practice to the other. We do not mean to suggest that there should be two different sets of rules. On the contrary, there can be only one. But when the rules are loosely couched in terms of high principle, as are the canons, there is room for differences of opinion, hence the distinct possibility that they do not provide sufficiently explicit "no trespassing" signs for those who may approach the invisible line of proscription. For this reason, if for no other, simple justice dictates that in arriving at a final determination all doubts be resolved in favor of the respondent.

■ We find that the facts of Count 7 and Count 8 do not warrant disciplinary action. With respect to Count 9 we find that Taylor's conduct toward Miss Arnold did violate Canon 18 and justifies a public reprimand. Nothing is more vital to the administration of justice than the freedom of witnesses from the fear of retribution and embarrassment. They must be protected in their coming and going. That Taylor was a litigant as well as a lawyer in the proceeding in which she testified did not excuse him from his obligation as a lawyer to treat her with the same consideration as if he had not been personally involved.

■ Counts 1, 2, 3 and 5 all have to do with a course of conduct during one trial and should, we think, be treated as one charge. Disregarding the issue of whether Judge Pound did or did not actually mouth the words "dirty son-of-a-bitch" at Taylor, we find that Taylor violated Canon 1 in

that he consistently and conspicuously failed to maintain a respectful attitude toward the trial court and that he violated Canon 22 in that while addressing the court he made statements intended to influence the jury or bystanders.

■ With respect to Canon 1, the fact that a presiding judge may not measure up to what he ought to be, or what counsel thinks he ought to be, is no excuse for discourtesy on the part of counsel. Two wrongs do not make a right. Whatever may be the judge's conduct, the remedy lies somewhere else, and if both court and counsel misbehave the damage to the profession and to the image of justice in the public eye is doubled.

With respect to Canon 22, there can be no doubt, even in the jungle, that Taylor intentionally said things in the hearing of the jury that he knew, or as a lawyer should have known, were not relevant to but might nevertheless have an effect upon its deliberations. For example, while certainly not acting beyond the bounds of propriety in insisting that the judge make an immediate disposition of the contempt matter (Count 1), he knew it was not a circumstance the prospective jurors under voir dire might properly have in mind when later determining the guilt or innocence of his clients. And again, had Judge Pound actually called him a vile name, to announce it to the jurors and public assembled was a flagrant and inexcusable impropriety, entirely unnecessary to the legitimate process of having it reflected in the transcript.

We suppose that an attempt to outlaw gallery play in the courtroom would be about as successful as the current effort to ban the private possession of firearms. Nevertheless, intoxication induced by his own histrionics cannot excuse an advocate's excesses. He indulges at his own risk. Under our system the jury's function is to weigh the evidence unalloyed by other factors, and it is the lawyer's obligation to preserve the integrity of that system. The intentional introduction of improper informa-

tion or comment amounts in plain words to cheating.

 It is common knowledge that in certain widely publicized trials of recent years a new breed of lawyers has instituted the studied technique of baiting the trial judge in order to convey to the public an impression that its courts are instruments of discrimination and injustice. Frequent contempt citations are the hallmark of that technique. It will not be tolerated in this jurisdiction. The representation of unpopular clients or points of view does not clothe the lawyer with a special immunity from his obligations as an officer of the court. The evidence in this case suggests (though by no means does it prove) that Taylor may at least have been conducting a precarious flirtation with this improvident new school of thought. We note, for example, both Judge Colson's and Taylor's own references to other instances in which he has been fined for contempt of court. Frequent and repeated punishment for contempt of court indicates that a lawyer is not fit to practice law. It may be that with a more extensive investigation the bar association could have produced a better case in this instance. As it is, however, the serious charges are largely confined to one trial, which would not constitute a fair basis for a determination that Taylor is a deliberate and persistent violator so as to merit disbarment or a substantial period of suspension, and certainly he should not be made a scapegoat for the sins of others.

The trial committee was of course more familiar with the case than the governors of the bar association, and we are favorably impressed by its analysis and recommendations. Since, however, the members of the committee saw violations in some instances (such as Counts 7 and 8) where we hold there was none, it seems appropriate that the recommended disciplinary action be modified to scale. It is therefore our judgment that the respondent be publicly reprimanded and suspended from the privilege of practicing law in this state for a period of six months.

The foregoing disposition obviates consideration of Point 6 (that the recommended punishment is disproportionately great) and leaves only the question of costs. It is our judgment that 50% of the costs of the proceeding be taxed against the respondent.

STEINFELD, C. J., and EDWARD P. HILL, Jr., MILLIKEN, NEIKIRK and OSBORNE, JJ., concur.

REED, J., concurs in the result that this court is empowered to decide the case and that the respondent be suspended for six months.