In Re: Objections to the Nomination Petition of James R. Cavanaugh for the 1982 Primary Election for the Democratic Nomination for the Office of Justice of the Supreme Court of Pennsylvania.

Heard March 23, 1982, by Judge Blatt. Reargued April 19, 1982, before Judges Blatt, MacPhail and Doyle, sitting as a panel of three.

*Richard L. Orwig, Edelman, O'Pake, Malsnee & Orwig,* for petitioner.

*Gregory M. Harvey,* with him *Marc J. Sonnenfeld,* of counsel, *Morgan, Lewis & Bockius,* for respondent.

*Mollie A. McCurdy,* Deputy Attorney General, with her *Allen C. Warshaw,* Deputy Attorney General, Chief of Special Litigation Section and *LeRoy S. Zimmerman,* Attorney General, for Commonwealth of Pennsylvania.

MEMORANDUM OPINION AND ORDER BY JUDGE BLATT, April 6, 1982:

Objections have been filed[1] to the nomination petitions of James R. Cavanaugh (candidate) for the Democratic nomination for the office of justice of the Pennsylvania Supreme Court. It is alleged that the candidate failed to obtain 100 valid signatures from each of 5 counties as required by Section 912(b) of the Election Code, Act of June 3, 1937, P.L. 1333, *as amended,* 25 P.S. §2872(b).[2]

A hearing was conducted in this matter on March 23, 1982, at which time the candidate's counsel conceded that more than 100 valid signatures were obtained from only four counties.[3] It was argued, how-

---

[1] The objections were filed by Forrest G. Schaeffer.

[2] 25 P.S. §2872(b) provides:

Number of signers required; nomination petitions of candidates at primaries shall be signed

. . . .

(b) If for a State office to be filled by a vote of the electors of the State at large, for the office of delegate or alternate delegate at large to a National party convention, or for the office of member of the National committee, by at least one hundred registered and enrolled members of the proper party in each of at least five counties of the State.

[3] The counties of Bucks, Lackawanna, Philadelphia and York.

ever, that the geographic distribution requirement set forth in the Election Code was unconstitutional as being a violation of the equal protection clause of the Fourteenth Amendment of the United States Constitution and that, inasmuch as the nomination petition admittedly contained over 500 valid signatures, it should be upheld.

The candidate points to the holding of the U.S. Supreme Court in *Moore v. Ogilvie,* 394 U.S. 814 (1969), to support his contention. It was held there that an Illinois statute requiring independent candidates for nomination for President and Vice-President to obtain 200 signatures from each of 50 different counties was unconstitutional. The necessity for such geographic distribution was held in violation of the "one person one vote" principle enunciated in *Baker v. Carr,* 369 U.S. 186 (1962) in that it gave voters in less populous counties a greater ability to nominate candidates than voters in more densely populated counties and thereby impermissibly diluted the voting strength of the latter group.[4] The candidate also relies heavily on an unreported decision of the Federal District Court for the Eastern District of Pennsylvania, *Elliott v. Shapp,* Civil Action No. 76-1277 (1979), which held Section 912(a) of the Pennsylvania Election Code, 25 P.S. §2872(a) to be unconstitutional because it requires candidates for President and United States Senator to obtain signatures of 100 registered voters from each of 10 counties.[5] It is argued that these decisions and the rationale employed therein are equally applicable here.

---

[4] The Court pointed out that the electorate in 49 counties representing 93.4% of the registered voters in Illinois could not nominate an independent candidate while 6.6% of the voters in the remaining 53 counties of that state could effect such a nomination.

[5] That decision was not appealed by the Commonwealth.

The objector contends first that the doctrine of "one person one vote" proclaimed by *Baker v. Carr* is not applicable to judicial elections. *See e.g., Wells v. Edwards,* 347 F. Supp. 453 (M.D. La. 1972) *aff'd* 409 U.S. 1095 (1973); *Holshouser v. Scott,* 335 F. Supp. 928 (M.D. N.C. 1971), *aff'd* 409 U.S. 807 (1972). We do not believe, however, that these cases or the others cited by the objector are persuasive here.

In *Wells,* it was held that the "one person one vote" principle did not apply to a Louisiana statute which provided that each judicial district in the state would elect a supreme court justice, even though the relative populations of those districts were not comparable. The court in *Wells* decided, as have other courts, that judges need not be elected from districts which are of equal population, because judges are not *representatives* of the people and the voters do not have a right to equal allocation of judicial services. *See also, Gilday v. Board of Elections of Hamilton County,* 472 F.2d 214 (6th Cir. 1972); *Concerned Citizens of Southern Ohio, Inc. v. Pine Creek Conservancy District,* 473 F. Supp. 334 (S.D. Ohio 1977); *Buchanan v. Gilligan,* 349 F. Supp. 569 (N.D. Ohio 1972). The present case, however, does not involve an allegation of unequal representation of the electorate in judicial offices. It is premised upon the argument that 25 P.S. §2872(b) serves to dilute the *voting power* of the electorate who reside in more populous counties in choosing an official who is to be elected by voters in an at-large state primary. The real concern here is whether or not *each voter in the state has the same influence in nominating a supreme court justice as each other voter.*

In *Holshouser,* the court upheld a North Carolina law providing that judges were to be nominated by primaries in individual judicial districts, but that they

were to be elected in a state-wide general election. It was argued there that the votes of the electorate in the individual primaries were diluted by the election of the judges for each district in a state-wide election. It was held, however, that each voter there was given equal voting power in his district in the primary election, that each voter had an equal influence in the general election and that, *in the absence of a showing that the votes of one portion of the electorate were given greater weight than those of another,* the "one person one vote" doctrine did not apply. The candidate here asserts that the geographic distribution requirement of 25 P.S. §2872(b) imposes such an inequality in voters' influence. We also believe that it does and, therefore, that the "one person one vote" principle is applicable here.[6]

As to the merits of the constitutional challenge, the objector and the Commonwealth[7] contend that the court's decision in *Elliott v. Shapp* was incorrect and

---

[6] The objector has also argued that the candidate here has asserted the unconstitutionality of the statute in an untimely manner by raising this question as a defense to this objection to his nomination petitions. We are hard-pressed to imagine a more appropriate time to raise the issue.

A question was also raised as to the candidate's standing to challenge the constitutionality of 25 P.S. §2872(b). We have, however, granted the motion of Thomas Darcy to intervene and, inasmuch as his status as a Democrat registered in the county of Philadelphia and as a circulator and signatory of the candidate's nomination petitions subject him directly to the dilution of voting influence concerned here, there can be no question that he would have standing to raise this constitutional issue. *See William Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975).

[7] The Commonwealth through the Office of the Attorney General was made a party to this action when it became apparent that the constitutionality of a Commonwealth statute was being challenged.

that it should be disregarded here. It is argued that the state's interest in maintaining a manageable number of candidates on the ballot and in ensuring that a candidate for state-wide office has at least a modicum of support throughout the Commonwealth outweighs the de minimis burden placed upon the voters here and that we should therefore determine only whether or not the geographic distribution requirement here concerned has a rational relationship to those ends so that the "strict scrutiny" doctrine would not apply. It is argued alternatively that, if we determine that the statute should be strictly scrutinized, this Court should hold that the Commonwealth has a compelling state interest here which is fulfilled by 25 P.S. §2872(b).

In *Elliott v. Shapp,* the court held that 25 P.S. §2872(a) had an adverse effect on a fundamental right—*i.e.,* the voting franchise—and determined that the rational relationship test was inappropriate. And, in reliance on *Moore v. Ogilvie,* the court refused to examine the degree of the impact imposed on the franchise and held that, where there was any showing of a dilution of voting rights, strict scrutiny of the relevant statute would be applied. We likewise believe that the strict scrutiny test, not the rational relationship test, should be applied here, because the statute here imposes a facial dilution of voting power. *McCarthy v. Garrahy,* 460 F. Supp. 1042 (D. R.I. 1978).

Even were we to examine the degree of impact on the voting franchise, to determine if it was de minimis, as the objector requests, we would be forced to conclude that 25 P.S. §2872(b) imposes a substantial dilution of the voting influence of the electorate in more populous counties. A review of the Pennsylvania Bureau of Elections' compilation of the number of registered voters for the November 1981 election,

which was submitted as evidence at the hearing in this matter, reveals a significant amount of such dilution. The four counties with the highest number of registered voters (Allegheny, Delaware, Montgomery and Philadelphia) have approximately 41.8% of the 5,689,184 registered voters in the state. Even if all of these voters were to sign a petition to nominate a particular candidate, that candidate's name would not be placed on the ballot under the requirement of the law here in question without at least 100 more signatures from a fifth county. Conversely, the voters in the five counties with the fewest number of registered voters (Cameron, Forest, Fulton, Montour and Sullivan) *could* effect such a nomination *even though they represent only 39% of the total electorate.* Voters in the least densely populated counties would consequently have an influence over ballot access which is *more than 100 times greater* than that enjoyed by voters in the most heavily inhabited counties. We can certainly not characterize such dilution as de minimis.[8]

Having determined that strict scrutiny of 25 P.S. §2872(b) is called for, we must still determine, of course, whether or not that section serves a compelling state interest which cannot be attained in any other manner. *Elliott v. Shapp.* Admittedly, there can be little dispute that the Commonwealth has some

---

[8] We would note that even if we were to examine the dilution of voters' influence among members of only the Democratic party, the nomination for which party is concerned here, the voting records indicate that the Democratic voters in the four counties with the highest Democratic registration (Allegheny, Luzerne, Philadelphia and Westmoreland) account for 47.6% of the total number of all registered Democrats in the state while the 5 counties with the lowest number of Democrats (Cameron, Forest, Fulton, Snyder and Sullivan) contain only .33% of the total. As is readily apparent, the dilution of voting influence for Democratic voters is even *more* severe than that for the general electorate.

interest in the regulation of access by candidates to the ballot and in ensuring that a candidate for a state-wide office has at least a minimal degree of support in areas of the state other than his own. We do not believe, however, that such an interest is "compelling" or would give the state license to infringe upon the voting franchise. *McCarthy v. Garrahy; Socialist Labor Party v. Rhodes*, 318 F. Supp. 1262 (S.D. Ohio 1970) *aff'd mem. sub nom. Sweetenbaum v. Gilligan*, 409 U.S. 942 (1972). Moreover, even were we to find that such an interest *is* "compelling", we would have to strike down the county-based distribution requirement utilized here, for, as has been pointed out, such a system does not take into account the wide differences in population among the various counties. An equally effective method by which the Commonwealth could achieve its legitimate aims would be to require signatures from different *congressional* districts. Inasmuch as all such districts have almost the same population, the problem of dilution of voter influence and the violation of the "one person one vote" principle would not arise.[9] *Udall v. Bowen*, 419 F. Supp. 746 (S.D. Ind. 1976) *aff'd*, 425 U.S. 947 (1976).

. We must hold, therefore, that the Commonwealth's interest as implemented by 25 P.S. §2872(b) is not compelling, that an alternative and constitutionally valid method to achieve legitimate state aims is available and that, consequently, the section of the Election Code here concerned cannot withstand evaluation under the strict scrutiny test.

Finally the Commonwealth argues that, under re-apportionment cases, a greater disparity in population is allowed among state legislative districts than

---

[9] Even the present state senatorial and state representative districts would provide more equitable voter population groups than do the 67 counties with their widely different populations.

is permitted among congressional districts[10] and that this Court should therefore condone more dilution of voting influence here where nominations of state officials are concerned as compared to *Moore* or *Elliott* which struck down voter dilution involving candidates for federal offices. No case law has been cited, however, which supports such a distinction between elections for state and federal offices in the present context, and our review of the cases indicates that courts have applied the theory of "one person one vote" equally to elections in both categories. *See e.g., Communist Party of Illinois v. State Board of Elections,* 518 F.2d 517 (7th Cir. 1975) *cert. denied,* 423 U.S. 986 (1975); *Socialist Labor Party v. Rhodes.* We cannot, therefore, accept this diffentiation.[11]

For all of the reasons discussed above, we must hold that the geographic distribution requirement for signatures on nomination petitions contained in 25 P.S. §2872(b) is a violation of the "one person one vote" principle and is consequently invalid under the equal protection clause.

Having so concluded, however, our resolution of this matter still requires that we now determine how many signatures the candidate here must produce in order to have his name placed on the Democratic primary ballot. In *Elliott v. Shapp,* the court found that a minimum of 1000 signatures was sufficient for candidates for nomination for President or for United

---

[10] In *Mahan v. Howell,* 410 U.S. 315 (1973), the Supreme Court permitted a 16.4% deviation among the populations of state legislative districts, although it has found a 3.3% deviation in the population of congressional districts to be impermissible. *White v. Weiser,* 412 U.S. 783 (1973).

[11] We would note that, even were we to permit a greater degree of dilution of votes for state offices than for federal positions, we would nevertheless be forced to find that the amount of dilution here is far more serious than we would be able to permit.

States Senator where the statute had called for at least 100 signatures from each of 10 counties. In implementing that decision, the Commonwealth's Department of State through its Bureau of Elections now requires such candidates to submit only that 1000 signature minimum.[12] For the sake of consistency among all candidates who are to be elected state-wide, therefore, whether for a state or a federal office, we will adopt the minimal requirement of 500 signatures provided for in 25 P.S. §2872(b).[13] And, inasmuch as the candidate's nomination petition here contains well over 500 unchallenged signatures,[14] we must hold that the objections here presented must be dismissed and we will issue an order directing the Secretary of the Commonwealth to certify the name of the candidate to be placed on the Democratic primary ballot for justice of the Pennsylvania Supreme Court in the primary election to be held on May 18, 1982.

## ORDER

AND Now, this 6th day of April, 1982, upon consideration of the objections filed to the nomination petition of James R. Cavanaugh for the Democratic nomination for the office of justice of the Pennsylvania Supreme Court, it is ordered that said objec-

[12] Testimony at the hearing indicated that the forms prepared by the Department of State for the nomination for the office of United States Senator which position will be on the ballot for the 1982 election, provide that potential candidates need only obtain a total of 1000 valid signatures in order to have their names placed on the primary ballot.

[13] *Elliott v. Shapp* involved 25 P.S. §2872(a) which governs the nomination of candidates for the offices of President and United States Senator, whereas 25 P.S. §2872(b) requires that persons seeking nomination for any state office which is to be elected state-wide must obtain at least 100 valid signatures from each of 5 counties.

[14] The candidate's nomination petitions contained 1191 signatures which were not challenged.

tions are hereby dismissed. The Secretary of the Commonwealth of Pennsylvania is directed to certify the name of James R. Cavanaugh to the proper officials for inclusion on the ballot of the Democratic Party primary election of May 18, 1982.

The prothonotary is directed to notify forthwith the parties hereto of this order and to certify a copy thereof to the Secretary of the Commonwealth.

ORDER

AND Now, this 12th day of April, 1982, it is ordered that this Court's memorandum opinion in the above-captioned matter filed on April 6, 1982 be clarified by the amendment of the first full sentence on page 8 which shall now read: "For the sake of consistency among all candidates who are to be elected state-wide, therefore, whether for a state or federal office, we will use the rationale adopted in Elliott. v. Shapp regarding candidates subject to the provisions of 25 P.S. §2872(a)[13] and we will order that candidates subject to the provisions of 25 P.S. §2872(b) obtain a minimum of 500 signatures."

ORDER

AND Now, April 20, 1982, the order of this Court entered April 6, 1982, dismissing the objections to the nomination petition of James R. Cavanaugh for the Democratic nomination for the office of Justice of the Pennsylvania Supreme Court is vacated. The Secretary of the Commonwealth is directed not to certify the name of James R. Cavanaugh to the proper officials for inclusion on the ballot of the Democratic Party primary election of May 18, 1982.

Opinion to follow.

The Prothonotary is directed to notify forthwith the parties hereto of this order and to certify a copy thereof to the Secretary of the Commonwealth.

Judge BLATT dissents to this order.

632

OPINION BY JUDGE MACPHAIL, April 22, 1982:

Objections have been filed[1] to the nomination petitions of James R. Cavanaugh (candidate) for the Democratic nomination for the office of justice of the Pennsylvania Supreme Court. It is alleged that the candidate failed to obtain 100 valid signatures from each of 5 counties as required by Section 912(b) of the Election Code, Act of June 3, 1937, P.L. 1333, *as amended,* 25 P.S. §2872(b).[2]

A hearing was conducted in this matter before Judge GENEVIEVE BLATT on March 23, 1982, at which time the candidate's counsel conceded that more than 100 valid signatures were obtained from only four counties.[3] It was argued, however, that the geographic distribution requirement set forth in the Election Code was unconstitutional as being a violation of the equal protection clause of the Fourteenth Amendment of the United States Constitution and that, inasmuch as the nomination petition admittedly contained over 500 valid signatures, it should be upheld. In a decision issued April 6, 1982, Judge BLATT dismissed the objections to the petitions, finding that said geographic distribution requirement was unconstitutional. Reargument before the present panel of

---

[1] The objections were filed by Forrest G. Schaeffer.

[2] 25 P.S. §2872(b) provides:

Number of signers required; nomination petitions of candidates at primaries shall be signed

. . . .

(b) If for a State office to be filled by a vote of the electors of the State at large, for the office of delegate or alternate delegate at large to a National party convention, or for the office of member of the National committee, by at least one hundred registered and enrolled members of the proper party in each of at least five counties of the State.

[3] The counties of Bucks, Lackawanna, Philadelphia and York.

judges was granted, and we now vacate the prior decision of this Court and uphold the objections to the petition.

The candidate points to the holding of the U.S. Supreme Court in *Moore v. Ogilvie,* 394 U.S. 814 (1969), to support his contention. It was held there that an Illinois statute requiring independent candidates for nomination for President and Vice-President to obtain 200 signatures from each of 50 different counties was unconstitutional. The necessity for such geographic distribution was held in violation of the "one person one vote" principle enunciated in *Baker v. Carr,* 369 U.S. 186 (1962) in that it gave voters in less populous counties a greater ability to nominate candidates than voters in more densely populated counties and thereby impermissibly diluted the voting strength of the latter group. The candidate also relies heavily on an unreported decision of the Federal District Court for the Eastern District of Pennsylvania, *Elliott v. Shapp,* Civil Action No. 76-1277 (1979), which held Section 912(a) of the Pennsylvania Election Code, 25 P.S. §2872(a) to be unconstitutional because it requires candidates for President and United States Senator to obtain signatures of 100 registered voters from each of 10 counties.[4] It is argued that these decisions and the rationale employed therein are equally applicable here. While we cannot deny that these cases evidence the prevailing view of the courts in regard to county distribution requirements, *see, e.g., McCarthy v. Garrahy,* 460 F. Supp. 1042 (D. R.I. 1978); *Communist Party of Illinois v. Ogilvie,* 357 F. Supp. 105 (N.D. Ill. 1972); *Socialist Workers Party v. Hare,* 304 F. Supp. 534 (E.D. Mich. 1969), we believe the present situation is distinguishable from these cases.

---

[4] That decision was not appealed by the Commonwealth.

We feel that it is important initially to understand the effect of the Pennsylvania election laws upon the rights of the state's voting populace. A review of the Pennsylvania Bureau of Elections' compilation of the number of registered voters for the November 1981 election reveals that the four counties with the highest number of registered voters have approximately 41.8% of the registered voters in this state, not even a majority. The total number of signatures required for a candidate to be placed on the ballot is 500, or .00878% of the registered voters. Furthermore, prospective candidates for judicial election may cross-file and seek nomination of multiple parties.[5]

Finally, prospective candidates not seeking nomination for a political party may, through the use of Section 951 of the Election Code, 25 P.S. §2911, obtain ballot access by getting signatures, without any geographic strictures, equal to two percent of the largest entire vote cast for any elected candidate in the state at large in the last statewide election.

With these facts in mind, we will proceed to examine the development of the equal protection clause as it applies to election cases. The first U.S. Supreme Court case to recognize an equal protection violation in county distribution requirements was *Moore v. Ogilvie.* In *Moore,* the Court was faced with a challenge by independent candidates for President to an Illinois law which required 25,000 signatures for attaining a position on the general election ballot, subject to a proviso that there be at least 200 signatures from each of 50 of the state's 102 counties. The population disparity in Illinois was such that 93.4% of the population resided in the 49 most populous counties. The Court found such a scheme unconstitutional.

---

[5] In fact, the candidate here has filed nomination petitions for the Republican Party.

That decision has been followed in a number of cases since; for example, striking down a New York law requiring at least 50 signatures from every county in the state. *Socialist Workers Party v. Rockefeller*, 314 F. Supp. 984 (S.D. N.Y.) *aff'd*, 400 U.S. 806 (1970), an Ohio statute requiring independent candidates to have 200 signatures from each of thirty of the state's eighty-eight counties, *Socialists Labor Party v. Rhodes*, 318 F. Supp. 1262 (S.D. Ohio 1970) *aff'd*, 409 U.S. 942 (1972) and a statute in Michigan requiring new political party candidates to not only obtain a certain percentage of signatures of the state, but also to obtain 100 signatures from each of ten counties, with a further restriction that not more than 35% of the signatures could come from any one county. As is readily apparent in these cases, much of the concern about these statutes is the veto power given to a minority of the state population over the majority's desires. This "veto" aspect was highlighted by the Supreme Court's decision in *Buckley v. Valeo*, 424 U.S. 1 (1976), where that Court, in upholding a portion of the federal campaign financing law requiring candidates to run in 20 state primary elections to receive primary election funds, noted that *Moore v. Ogilvie* was distinguishable in that only 7% of Illinois voters could have blocked a candidate from qualifying, even though they could not have defeated the candidate in the general election. 424 U.S. at 106 n. 144. Similarly, the statute here presently under review does not allow a minority to frustrate the majority will. Rather, any candidate who truly cannot muster 100 signatures from one other county besides the four largest (Allegheny, Delaware, Montgomery and Philadelphia), particularly when the option to cross-file exists, obviously does not have the majority support necessary to win a general election.

It is, we believe, somewhat beside the point that the smallest five counties could effect a nomination; that may only speak to the need for further strengthening of the election rules. Voters in any five counties could effect a nomination and it would take the combined action of 63 counties to prevent a nomination.[6]

Our examination of the myriad of cases in this regard leads us to believe that the case of *Zautra v. Miller,* 348 F. Supp. 847 (1972) provides us with the proper method of analysis in regard to the distribution requirements here at issue. In *Zautra,* a statute in Utah requiring 500 signatures, with at least 10 signatures of registered voters from each of 10 of the state's 29 counties, was challenged. The law only applied to groups who sought to qualify as a political party, and any individual could gain an independent spot on the ballot by gathering 300 signatures statewide without geographic restriction. The Court saw this statute as placing only a minimal burden upon prospective candidates, though in theory a disproportionate weight for certain voters did exist. The question, as phrased by the Court, was "whether the Fourteenth Amendment mandate[d] the elimination of even minimal geographic burdens of conceivably discriminating effect." *Id.* at 850. The Court went on to conclude that in a case where the franchise was affected "somewhat obliquely" the guiding review standard was as enunciated in the case of *Bullock v. Carter,* 405 U.S. 134 (1972), where the Supreme Court enunciated a standard that a discriminatory law must have a real and appreciable *impact* on voters' rights before the strict scrutiny test of reasonable necessity

---

[6] Though we do not intend to intimate agreement with the decision in *Elliott v. Shapp,* we do note that the ten county requirement there could have resulted in the desires of roughly 60% of the voters being frustrated by the remaining 40%.

would be applied in the challenge, 405 U.S. at 144. A law with no real and appreciable impact would only require "rational basis" scrutiny. The Court in *Zautra* believed that the minimal signature requirement, combined with the independent access provided under the law, had no real impact and concluded that the law need only pass a "rational basis" analysis and thus upheld the statute's constitutionality.

We likewise believe that the minimal signature requirement imposed, combined with the cross-filing or independent access available to condidates, has no "real and appreciable impact" on the franchise rights of voters in Pennsylvania and thus we find the state's interests of ensuring serious candidacies, ensuring manageable ballot size, and ensuring that prospective candidates have a significant modicum of support provide a rational basis for the challenged law.[7]

Further, the presently unanimous view of courts throughout the land provides yet another reason for

---

[7] Even if we were to conclude that strict scrutiny should be applied in every case where the franchise suffers dilution, as was held in *Elliott v. Shapp*, we believe these asserted interests of seriousness, manageability and sufficient support would be sufficiently compelling to uphold the law. *See American Party of Texas v. White*, 415 U.S. 767 (1974) ; *Lubin v. Panish*, 415 U.S. 709 (1974) ; *Jenness v. Fortson*, 403 U.S. 431 (1971).

We would also note that this is a case involving a state election, not a federal office. And just as the one man-one vote principle came to be applied to federal reapportionment in a much stricter fashion than it is applied in state reapportionment, *compare White v. Weiser*, 412 U.S. 783 (1973) (3.13% deviation in congressional reapportionment unconstitutional) *.with Mahan v. Howell.* 410 U.S. 315 (1973) (16.4% deviation in state legislature reapportionment permitted), we believe that signature requirements in state elections should be given more leeway than have been. given federal ballot access cases, particularly since the ballot access cases rely upon the reapportionment cases for their legal foundations. *See Moore v. Ogilvie.*

not finding the statute here at issue unconstitutional in the present context. The one person-one vote principle, upon which the candidate relies, as initially announced in *Baker v. Carr* was designed to remedy the unequal *representational* rights of voters. ''The first principle inherent in our republican form of government is that individual citizens submit to rule by legislative fiat enacted by a majority of a popularly elected legislative body working within a constitutional framework. When the representatives to that legislative body are malapportioned among the several districts within the political unity, then the voting strength of the individual citizens in these subdivisions is of unequal weight.'' *Buchanan v. Rhodes,* 249 F. Supp. 860 (N.D. Ohio 1960), *appeal dismissed,* 385 U.S. 3 (1966).

At issue in this case is the nomination petition for judicial office. ''Manifestly, judges . . . are not representatives in the same sense as are legislators or the executive. Their function is to administer the law, not to espouse the cause of a particular constituency.'' *Stokes v. Fortson,* 234 F. Supp. 575 (N.D. Ga. 1964). The numerous courts which have been presented with judicial election cases are in rare unanimity on this point. Judicial officers are not subject to the one person-one vote principle and therefore a state's choice regarding the method of electing its judiciary is not subject to an equal protection challenge.[8] *See, e.g., Voter Information Project Inc. v. City of Baton Rouge,* 612 F.2d 208 (1980); *Gilday v. Board of Elections,* 472 F.2d 214 (1972); *Scott v. Hill,* 449 F.2d 634 (1971); *Wells v. Edwards,* 347 F. Supp. 453 (M.D. La. 1972), *aff'd. mem.,* 409 U.S. 1095 (1973); *Hols-*

---

[8] Presuming, of course, that there has not been some sort of arbitrary, capricious, or invidious action in the choice of election method.

*houser v. Scott,* 335 F. Supp. 928 (M.D. N.C. 1971), *aff'd mem.,* 409 U.S. 807 (1972); *Concerned Citizens v. Pine Creek Conservancy District,* 473 F. Supp. 334 (S.D. Ohio 1977); *Kentucky State Bar Ass'n. v. Taylor,* 482 S.W.2d 574 (Ky. 1972); *Cox v. Katz,* 22 NY2d 903, 241 N.E.2d 747 (1968).

As we have previously recognized, the one person-one vote provisions for nomination petition cases have followed, and relied upon, the reapportionment types of cases. *See Moore v. Ogilvie.* And in view of the fact that reapportionment has not been required in the judicial election process[9] then we fail to perceive how one person-one vote can be applied to judicial nominating petition cases.[10]

We wish, finally, to emphasize two other problems which would attend a holding of unconstitutionality. First of all there is the matter of *this* candidate being placed on the *present* ballot. The objector, relying upon the law as it existed prior to this constitutional challenge, had no reason to assert challenges to any other signatures in light of the fact that there was stipulated that the candidate had only four

---

[9] *Wells v. Edwards* is instructive on this point. There the State of Louisiana elected its seven Supreme Court Justices from seven different judicial districts, even though the relative populations of those districts were not comparable. Reapportionment was not required. We note further the disparity of population within the judicial districts of Pennsylvania which would necessarily be subject to a similar reapportionment challenge, should the one person-one vote rule be applied.

[10] The candidate has pointed to the dissent in the Supreme Court's summary affirmance to *Wells* in an effort to show that the Supreme Court has not accepted the concept that judges are exempt from one man-one vote. *But cf. Concerned Citizens of Southern Ohio v. Pine Creek Conservancy District,* 429 U.S. 651 (1977) (REHNQUIST, J., dissenting) *on remand* 473 F. Supp. 334 (S.D. Ohio 1977).

100 signature counties. Furthermore, any other candidates have apparently complied with the law in obtaining ballot access.

Secondly, we would like to point out a possible problem with a 500 signature statewide requirement. We have previously discussed the 2% statewide requirement for independent candidacies. And undoubtedly this requirement would generally pass constitutional muster, see *Jenness v. Fortson,* 403 U.S. 433 (1971). However, we perceive grave constitutional problems concerning the rationality of a system whereby prospective party candidates need only obtain 500 statewide signatures and independent candidates need 2% of the largest number of votes cast in the prior state election.[11]

We therefore hold that the candidate has failed to sustain his heavy burden of showing that Section 912(b) is unconstitutional and will therefore order candidate Cavanaugh's name not be certified.

---

[11] By our calculation, if only 30% of the 5.6 million registered voters had voted in the prior election, then 33,600 signatures would be needed by an independent candidate.

---

Dissenting Opinion by Judge Blatt:

I respectfully dissent.

For the reasons set forth in the Memorandum Opinion filed with the Order of April 6, 1982 in this case, I would continue to hold that the geographic distribution requirement of 25 P.S. §2872(b) is unconstitutional and that the name of James R. Cavanaugh should be placed on the Democratic ballot for the office of Justice of the Supreme Court of Pennsylvania for the primary election to be held on May 18, 1982.